**VOGT INSTANT FREEZERS, Inc., v. NEW YORK ESKIMO PIE CORPORATION.**

No. 86.

Circuit Court of Appeals, Second Circuit.

Feb. 13, 1934.

Dean, Fairbank, Hirsch & Foster, of New York City (Clair W. Fairbank and S. A. Demma, both of New York City, of counsel), for plaintiff-appellant.

Edward G. Curtis, of New York City (Blair, Curtis & Dunne, of New York City, of counsel), for defendant.

Before MANTON, L. HAND, and CHASE, Circuit Judges.

CHASE, Circuit Judge.

Both of these patents cover inventions of Clarence W. Vogt. No. 1,733,740 relates to an apparatus for manufacturing ice cream and the like and No. 1,742,171 to a process of such manufacture. Both are the result of one application which was divided during its prosecution in the Patent Office. The method of manufacture with the machine disclosed in No. 1,733,740 is the process covered in No. 1,742,171.

Vogt formerly was in the employ of Eskimo Pie Corporation at Louisville, Ky. That corporation was organized under the laws of Delaware, and controls the defendant, a New York corporation, through the ownership of a sufficient amount of the latter's capital stock. The defendant has a manufacturing plant in the Eastern district of New York.

Vogt was financed in respect to his inventions by the Eskimo Pie Corporation. After he had built and tested a machine which embodied his ideas and filed his patent application, he transferred all his rights in his inventions to his employer. Later he severed his connection with that corporation and organized the plaintiff corporation. Thereafter, and on December 5, 1927, the Eskimo Pie Corporation for a valuable and adequate consideration assigned to the plaintiff all its right and interest in the Vogt inventions and the applications of Vogt on which the patents in suit were granted. No. 1,733,740 was issued October 29, 1929, and No. 1,742,171 was issued December 31, 1929.

In freezing ice cream it is essential both to obtain a product satisfactory in texture and taste and to increase the likelihood of profit in manufacture, to aerate the mixture during the initial freezing period to get what is called overrun. To do this, air is whipped in by agitating the mixture in a container equipped with some means for stirring it in the presence of air while heat is withdrawn by a cooling process. As the mixture begins to freeze, the air causes it to expand. This first freezing is carried only to a lowering in temperature that leaves the thickened mixture sufficiently liquid to be drawn from the first freezer in a pipe. Formerly when the mixture had been aerated and frozen to this degree, it was drawn into cans which were placed in a cold room and allowed to stand some hours until the desired hardness of the product had been reach-

ed. At that point manufacture was complete and the ice cream was ready for removal from the cold room. This method took considerable time. In a room where the temperature was maintained at 20 degrees below zero it required from eight to twelve hours to harden sufficiently the contents of a five-gallon can and about five hours to harden that of a gallon can—the smallest container used.

Vogt took the initial freezing process as it had been practiced and combined it with a change in the manner of final hardening. Instead of placing the partly frozen product in cans to harden in the cold room, he built the machine of patent No. 1,733,740 to be placed in a cold compartment to harden the ice cream quickly. This machine had two revolving drums which were set near enough to each other to form a sort of pocket between them above the point of nearest approach. Each of them contained a freezing mixture of brine. The partly frozen ice cream was piped to the pocket and from there it spread over the outer surface of the rolls as they revolved toward each other. The thickness of the film was determined by the distance at which the rolls were set apart and was thus maintained as a constant. The low temperature of the room in which the machine was placed joined forces with the brine inside the rolls to freeze the film as hard as was necessary before one revolution of the rolls was completed. At this point on each roll a scraper was set which removed the film from the roll. The hardened product dropped on a conveyor belt which carried it to containers where it was packed closely with a compressor screw. Some of the overrun was lost in thus scraping off and packing the ice cream as such a loss is inevitable when some of the air cells are thus broken. The machine whose method of operation has been outlined was the one disclosed in the specifications of the patent, but it never was extensively used. In fact, neither of these patents has impressed the art. Vogt soon brought out a spray machine, not involved in this suit, and applied for a patent on that. A dispute which followed the refusal of Vogt to assign the spray machine application to the Eskimo Pie Corporation led to his ceasing to work for that company and eventually to the acquisition by the plaintiff of its rights to the patents in suit.

After the assignment to the plaintiff and before the patents issued, the defendant redesigned its apparatus for making ice cream in its Brooklyn plant and began using the new apparatus in May, 1929. A description of it was published in a trade magazine called "The Ice Cream Review" on August 3, 1929. The old way of aerating and partially freezing the ice cream was retained. Then the semifrozen mixture flowed down from the preliminary freezers to a tank from which small moulds set in a continuous conveyor were filled automatically. This conveyor then carried the moulds slowly through a cold hardening chamber and brought them to its outlet in about forty-five minutes. During this journey through the hardening chamber the ice cream in the moulds was gradually hardened. It was removed from the moulds as they emerged from the chamber. The conveyor carried the empty moulds through a hot water and steam bath and on to the filler tank where they were filled with additional semifrozen ice cream and the hardening process repeated. This is the machine and the process the defendant now uses and against which the charges of infringement are directed.

On September 4, 1929, an amendment to the Vogt apparatus disclosure was filed in the Patent Office, and in November, 1929, a similar amendment was made to the process disclosure. At these times new claims were added. All the claims now relied on were among such amendments.

The claims of No. 1,733,740 for the apparatus now said to be infringed are 9, 10, and 11. They read as follows:

"9. In an apparatus for freezing ice cream or the like, the combination with a freezer for whipping air into the mix and freezing it to a semi-plastic state, of means for hardening the same comprising a hardening chamber, means for delivering said mix in its semi-plastic state to said chamber, means for maintaining said chamber at a low degree of temperature, and means in said chamber for continuously advancing the mix through said chamber during the hardening operation.

"10. In an apparatus for freezing ice cream or the like, the combination with a freezer for whipping air into the mix and freezing it to a semi-plastic state, of means for hardening the same, comprising a hardening chamber, means for continuously delivering said mix in its semi-plastic state to said chamber, means for maintaining said chamber at a low degree of temperature, and means in said chamber for advancing said mix in a thin layer while subjected to the action of said low temperature, whereby the mix is hardened.

"11. In an apparatus for freezing ice cream or the like, the combination with a freezer for whipping air into the mix and freezing it to a semi-plastic state, of means for hardening the same comprising a hardening chamber, means for delivering said mix in its semi-plastic state to said chamber, means for maintaining said chamber at a low degree of temperature, and a conveyor in said chamber for continuously advancing the mix within said chamber until the hardening operation is substantially completed."

Those of No. 1,742,171 for the process are 9, 10, 11, 12, 14, and 15. They are:

"9. The process of freezing and hardening a substance of the character described, consisting in maintaining a freezing conveyor at a low degree of temperature, and conducting to and discharging therefrom on the substance to be hardened after it has been partially frozen in a semi-plastic state with a quantity of air incorporated therewith for obtaining the desired overrun whereby such aerated substance will become frozen to a substantially hardened state.

"10. The process of freezing a substance of the character described, consisting in whipping air into a mix while partially freezing it to a semi-plastic state, delivering said mix in its semi-plastic state to a hardening chamber, and continuously advancing it there-through while maintaining said chamber at a low degree of temperature whereby said mix will become frozen to a substantially hardened state while advancing there-through.

"11. The process of freezing a substance of the character described, consisting in whipping air into a mix while partially freezing it to a semi-plastic state, continuously delivering said mix in its semi-plastic state to a hardening chamber, and advancing said mix within said chamber while subjecting the same to the action of a low temperature whereby it will be substantially hardened therein.

"12. The process of freezing a substance of the character described, consisting in whipping air into a mix while partially freezing it to a semi-plastic state, delivering said mix in its semi-plastic state to a hardening chamber maintained at a low degree of temperature, and advancing said mix within said chamber while subjecting it to the low temperature thereof for causing the same to be further frozen to a substantially hardened condition."

"14. The process of freezing a substance of the character described consisting in par-tially freezing it to a semi-plastic state, delivering the same in its semi-plastic state to a hardening chamber maintained at a low degree of temperature and advancing said mix within said chamber while subjecting it to a low temperature for causing the same to be further frozen to a substantially hardened condition.

"15. A process of freezing and hardening a material of the character described, including simultaneously agitating the substance and freezing a portion of the water content thereof and thereafter advancing the partially frozen substance in a quiescent state while subjecting it to a low temperature to freeze a further portion of the water content and deliver a hardened product."

The composition of the claims as amended together with the time when the amendments were made afford ground for the belief, which the defendant entertains and strenuously urges upon us, that the amendments show a deliberate attempt to include the apparatus and process of the defendant within the scope of the plaintiff's patents. That is met by evidence tending to show that the amendments were drawn without knowledge of, or reference to, what the defendant was doing. The defendant insists that the new claims are void because new matter not supported by a supplemental oath has been added. We find it now unnecessary, and so inadvisable, to express any opinion on this phase of the appeal. The patents with the claims allowed have the prima facie validity which follows from the action of the Patent Office, and we find the decisive issues now involved may all be resolved by a decision as to infringement with the claims given their prima facie validity and the scope the prior art permits.

Before going to that, however, it is necessary to consider the effect, on the defense this defendant may present, of the fact that the Eskimo Pie Corporation was the former owner of the application on which, after division in the Patent Office, these patents were issued. The defendant is in fact, though in form a separate corporation, but a division of the Eskimo Pie Corporation. For present purposes its separate corporate status will be disregarded. Chicago, M. & St. Paul R. Co. v. Minn. C. & C. Ass'n, 247 U. S. 490, 38 S. Ct. 553, 62 L. Ed. 1229. The plaintiff insists that the defendant is estopped to deny that these patents cover its apparatus and process by showing that the claims allowed cover more than the prior art will permit. We do not so understand the law. While an

assignor may not, when sued for infringement by the assignee of a patent, defeat the patent itself, he may deny infringement, and in so doing is not estopped to resort to the prior art to secure a construction of the patent, consistent with validity, which limits its scope to the same extent that it would be limited in an action between the assignee and a stranger; the difference being merely that a stranger would also be free to contest validity. Noonan v. Chester Park Athletic Club Co. (C. C. A.) 99 F. 90; Westinghouse Electric & Mfg. Co. v. Formica Insulation Co., 266 U. S. 342, 45 S. Ct. 117, 69 L. Ed. 316. And this being so as to the assignee of an issued patent, it is, a fortiori, within the right of the assignor of a patent application to contest infringement and limit the patent's scope by reference to the prior art in a suit on the patent against him brought by the assignee of the application on the patent after it has been issued. Westinghouse Electric & Mfg. Co. v. Formica Insulation Co., supra.

Even a casual examination of the apparatus used by the parties shows that the defendant has employed a method of manufacture decidedly different from that of the plaintiff. The defendant not only makes ice cream, but its product is in an especial form consisting of a small block of ice cream coated with chocolate. Its apparatus hardens the ice cream into blocks of the desired size. The plaintiff makes ice cream chips which are then packed in cans, though it would seem that the chips could, if desired, be pressed into blocks as they are scraped from the rolls. The plaintiff's apparatus is capable of quick freezing induced both by the low temperature of the compartment in which the rolls turn and the freezing brine within the rolls themselves while the film to be frozen may be varied in thickness to obtain the most wanted result within reasonable limits as to the hardening time. The defendant depends wholly upon the low temperature of a cold tunnel for hardening and the dimensions of the blocks are determined by the size of the moulds and the extent to which they are filled. These dimensions in turn are controlled largely, though perhaps not absolutely, since blocks might probably be combined after being hardened, by the size of the pies to be made. In this way the defendant produces hardened blocks instead of frozen chips and does not subject the ice cream to cutting or crushing which tends to destroy the overrun obtained in the initial freezing.

With these differences in mind, attention may be directed to the prior art to determine what was new in the apparatus and the process patented and whether the defendant follows the patents or the prior art. There is no single new element in these patents. Nor does the plaintiff claim otherwise. The preliminary aeration and partial freezing of ice cream to a semiplastic state was old as Vogt recognized in his application. He said: "Heretofore it has been customary in the manufacture of ice cream and the like to mix the same, lowering its temperature to such a degree that it will be in a semifrozen or plastic state, and thereafter place such mixture in suitable containers, * * * in a * * * hardening room * * * until frozen to a solidified condition." He explained that some "features of the process are also applicable without the feature of aeration." The freezing of ice cream on internally cooled rolls or cylinders and taking it off with scrapers was old. In 1859, S. W. Smith disclosed that in his specifications and patent No. 23,271 was issued to him in that year. Among several other patents which disclosed this means for freezing are No. 475,817 to Sirrine, May 31, 1892; No. 491,104 to Hart, February 7, 1893; and No. 532,987 to Ottimo & Raffo, January 22, 1895, showed a variation of the process. A revolving cylinder was placed in a casing packed with ice; the cream was blown against the inner surface and scraped off when frozen. But the hardening on internally refrigerated rolls of a partially frozen aerated ice cream mixture was new with Vogt.

Attempts to freeze ice cream on such rolls were not very satisfactory. The manufacturers of that product on a commercial scale found hardening a semifrozen aerated mixture in containers placed in a cold room preferable notwithstanding the additional time it required. This hardening process was improved by the use of means for making the movement of the containers into and out of the cold room more easily accomplished; and what was done in this respect makes it impossible to accord to these Vogt patents sufficient scope to cover the apparatus and process used by the defendant. What the defendant does is clearly traceable wholly to that which was old when Vogt filed his application and which makes use of no new combination of means or methods which Vogt disclosed.

The defendant, unlike Vogt, uses the more leisurely method of hardening the ice cream without spreading it in a film on extremely cold cylinders having brine inside.

It clings to a modification of the old container in a cold room way. It merely uses that method in miniature and by making its containers (moulds) small is enabled to move them into and out of the cold room without there holding them at rest to give time for hardening. This will appear from a brief reference to what had been done before Vogt.

In 1925, the Mojonnier Bros. Company, manufacturers of equipment for handling ice cream and dairy products generally, installed in the plant of the Hydrox Corporation at Chicago, Ill., an automatic can-filling and conveyor system which was used to fill containers with partly frozen aerated ice cream and move them into and out of the cold hardening room. The containers were so large that they had to be taken off the conveyor and left in the cold room some hours before being placed on the conveyor again to go out. The hardening began as soon as the containers entered the cold room, and, had it been feasible to use a cold room large enough and cold enough to complete the process on one continuous trip through it with conveyors moving sufficiently fast to take the output of the preliminary freezers, it is obvious that no unloading and reloading of the conveyor in the cold room would have been necessary. Only in doing away with the need for this unloading and reloading has the defendant departed in any material respect from the Hydrox method which was well known before Vogt conceived his inventions. Moreover, the cooling of a warm substance while being carried on an endless conveyor through a cold compartment was old. The patent to Stollwerck, No. 277,804, issued May 15, 1883, shows that for cooling chocolate; the Paris patent, No. 423,946, issued March 25, 1890, adapts the process to cooling candy; that to Crouch, No. 1,308,753, issued July 8, 1919, to cooling soap. There are others, but these are enough to show that the hardening of ice cream as the defendant does it involved but the adaptation of such well-known devices and the use of lower temperatures. As the process of the defendant is based on the functions of the apparatus it uses, it differs from that of the plaintiff to the same degree that the apparatus differs. The plaintiff's patents disclose neither the apparatus nor the process of the defendant. On the contrary, Vogt selected that branch of the art which used cold rolls for quick hardening or freezing in a film and based his disclosure on that principle rather than on another branch of the same art, quite as well known, from which the apparatus of the defendant is derived.

When the claims of these patents are held, as they must be in view of the prior art, to the film on cold rolls way of hardening described in the specifications, the defendant is not found to infringe either patent. Compare Outlook Envelope Co. v. General Paper Goods Mfg. Co. (C. C. A.) 239 F. 877.

Decree affirmed.