WILSON *v.* NORGE CORPORATION.

1. PATENTS—ROYALTIES—LICENSE AGREEMENTS—CONSPIRACY—DU-
RESS—ATTORNEYS—EVIDENCE.

In inventor's suit against licensee to reinstate original royalty
agreement as to compressors and set aside modification agree-
ment reducing royalties and for accounting as to royalties al-
leged to have accrued under original agreement, plaintiff's
claim of conspiracy and duress on part of his former attorneys
and defendant *held,* not supported by evidence that attorneys
who had represented plaintiff before execution of original
agreement and during most of period prior to modification also
represented defendant in litigation during that period where
their appearance for defendant was known to plaintiff whose
interests in such litigation were closely allied to defendant's.

2. SAME—ROYALTIES—MODIFYING AGREEMENT—CONSPIRACY—DURESS
—EVIDENCE.

Inventor's claim that modification of exclusive license agreement,
reducing royalty due from defendant licensee, was procured by
defendant and plaintiff's former attorneys by means of con-
spiracy or duress effected by attorneys pressing for repayment
of funds advanced and payment for professional services ren-
dered, a sum stated to be upwards of $16,000, and as security
therefor obtaining an assignment of patents, which provided
for conditional reassignment within 60 days and defendant's
withholding of large sums due for royalties *held,* not supported
by record showing, among other things, that plaintiff entered
into such modifying agreement in the absence of, and appar-
ently without the knowledge of, his attorneys and they did not
commence action to collect and contemporary garnishment pro-
ceedings against defendant until about three months thereafter.

3. SAME—ROYALTIES—MODIFYING AGREEMENT—COMPOSITION OF HON-
EST CONTROVERSY—FRAUD.

Record in inventor's suit to cancel agreement modifying amount
due for royalties on compressor units used in electric refrigera-
tors *held,* to show that a close and perplexing question was

presented as to whether plaintiff's patents covered more units than were reported by defendant as so covered, that an honest controversy existed prior to the agreement, and composed thereby, as to whether plaintiff's patents covered such other units, and that there was no fraudulent concealment on part of defendant in reporting units in which plaintiff's patents were used.

4. SAME—LICENSES—VALIDITY OF PATENTS.

A licensee of a patentee cannot question validity of licensor's patents.

5. SAME—ROYALTIES—MODIFYING AGREEMENT—DURESS—FRAUD—CANCELLATION OF INSTRUMENTS.

Record in inventor's suit to cancel agreement reducing royalties due from licensee on compressor units *held*, not to sustain claims of duress or fraud practiced upon plaintiff entitling him to cancellation of modifying, and restoration of original, agreement, where original was cancellable upon a year's notice, an honest controversy existed between plaintiff and defendant as to whether his patents covered units defendant was then manufacturing and it was not a party to assignment plaintiff had made to his former attorneys as security for funds advanced and fees then claimed and under which plaintiff felt he was in danger of losing his patents entirely at time he made modifying agreement without their knowledge.

Appeal from Wayne; Parker (James S.), J., presiding. Submitted April 7, 1937. (Docket No. 12, Calendar No. 38,449.) Decided September 1, 1937. Rehearing denied November 10, 1937.

Bill by Edward Wilson against Norge Corporation, a Michigan corporation, to set aside a royalty agreement and have declared in force and effect a former royalty agreement, for an accounting and other relief. Bill dismissed. Plaintiff appeals. Affirmed.

*Oxtoby, Robison & Hull* and *Brownson, Murray & Marco (Oscar C. Hull, McKee Robison, Leo I. Frank-*

lin and *Clarence B. Zewadski,* of counsel), for plaintiff.

*George M. Clark* and *Leo W. Kuhn* (*G. A. Shallberg, Carlton Hill* and *Lewis D. Burch,* of counsel), for defendant.

NORTH, J.   Edward Wilson, a skilled mechanic and inventor, in 1915 obtained a patent on a rotary compressor which he had improved and developed in such a manner as made the device suitable and practical for use in the manufacture of electric refrigeration units.   Plaintiff assigned his rights in this patent to the National Pump & Compressor Company, a Delaware corporation, but except in the particulars hereinafter noted, such assignment is not material to the issues in the instant case; and notwithstanding the rights of defendant herein accrued in part through a contract between defendant and the National Pump & Compressor Company, we may treat the transaction as one directly between plaintiff and defendant.   The defendant, Norge Corporation, is a Michigan corporation, engaged in the manufacture of electrical refrigeration units and of electric refrigerators.   On April 21, 1928, the Norge Corporation entered into an agreement with plaintiff whereby the corporation obtained an exclusive license to patents which plaintiff had already obtained and to inventions for which he had filed applications for letters patent, and also to the right to use future inventions of plaintiff.   The agreement as finally consummated through a subsequent agreement between defendant and the National Pump & Compressor Company, provided for the payment by the Norge Corporation, as a royalty or license fee, of the sum of 90 cents on each rotary compressor sold

by defendant for refrigeration use and embodying any of the inventions covered by said agreement which should require for its operation, at its normal operative speed, motive power up to and including two horse power; and for a license fee of 5 per cent. of the defendant's selling price of certain other compressors in which plaintiff's device was used. The minimum royalty to be paid annually while the license was in force was $10,000. Notwithstanding the later agreement (September 8, 1928) was between defendant and the National Pump & Compressor Company, it is conceded that plaintiff is entitled to whatever royalties have accrued under the above mentioned contracts. Plaintiff alleges that in fact a much larger amount than he has been paid has accrued and is due to him under the contract provision for the payment of a royalty of 90 cents on each unit in which his device was used.

On May 11, 1932, plaintiff entered into another agreement with defendant in modification of the terms of the royalty agreement hereinbefore stated. By the terms of this later agreement the royalties to be paid plaintiff were reduced from 90 cents per unit to 10 cents per unit. Plaintiff alleges that he was induced to enter into the agreement of May 11, 1932, by fraud perpetrated upon him by the defendant and also in consequence of conspiracy and duress, as hereinafter more fully detailed. By this suit plaintiff seeks to have the agreement of May 11, 1932, canceled on the ground of fraud, conspiracy and duress, and to have the former agreement, which provided for the payment of a royalty of 90 cents per unit, held to be in full force and effect; and further that on the basis of the earlier agreement an accounting be had and defendant decreed to pay plaintiff the amount of the accumulated

royalties so ascertained. After taking proof at length in open court and hearing counsel for the respective parties, the circuit judge filed a written opinion and entered a decree dismissing plaintiff's bill of complaint and denying the relief therein sought. Plaintiff has appealed.

Because of its bearing upon other phases of this case, plaintiff's claim of conspiracy and duress should be given first consideration. The following additional facts are pertinent: For a number of years prior to plaintiff's first royalty contract with defendant, plaintiff had employed the firm of Rippey & Kingsland, patent lawyers of St. Louis, Missouri, to represent him in connection with his applications for patents, in interference proceedings, in the negotiations leading up to the execution of plaintiff's first contract for royalties with defendant and in other matters. These attorneys continued as such for plaintiff until about the 19th of April, 1932, on which date they obtained an assignment to themselves of plaintiff's patents as security for the amount plaintiff owed these attorneys for professional services and moneys expended in his behalf. It is plaintiff's claim that about this time these attorneys abandoned his interests and he charges in his bill of complaint that the Norge Corporation "connived and confederated" with Rippey & Kingsland to secure from plaintiff the modification of his contract for royalties with defendant whereby the rate was reduced from 90 cents to 10 cents per unit.

Plaintiff charges that during the period these attorneys represented him they also acted as attorneys for the Norge Corporation. But this fact must be viewed in the light of the following circumstances: A number of years prior to plaintiff's business contact with defendant he had employed, to

assist him in his work in building working models of rotary compressors according to plaintiff's designs and specifications, a man by the name of Rolaff. In this way Rolaff acquired knowledge concerning the inventions which plaintiff was developing, and Rolaff, unbeknown to Wilson, applied for patents covering features of rotary compressors which were later determined to be of Wilson's invention. The Norge Corporation, or others with which it is allied, unaware of the character of Rolaff's patent claims, entered into a contract with him in May, 1925, to pay royalties for the use of his device. Interference proceedings were later instituted between Wilson and Rolaff in the United States patent office to determine their respective rights. In January, 1929, Rolaff started suit in the Federal court for the eastern district of Michigan against the Norge Corporation to recover royalties which he claimed were due him. In defense of this suit the Norge Corporation employed Rippey & Kingsland and Mr. Rippey appeared for Norge Corporation and the other defendants. But obviously this was the most natural thing to do because of the intimate knowledge of these attorneys with the subject matter of the suit in the defense of which the Norge Corporation had the full cooperation of Wilson, who was also vitally concerned in defeating Rolaff's claim for royalties. All the facts and circumstances concerning the employment of the St. Louis attorneys by the Norge Corporation were known to Wilson. He made no complaint, and indeed there was no occasion for complaint. Instead Wilson's interests were closely allied with those of the Norge Corporation. The fact that his attorneys or either of them represented the Norge Corporation in the Rolaff litigation lends no support to plaintiff's present claim of conspiracy.

But plaintiff further complains of the conduct of Rippey & Kingsland in this regard. Being pressed for payment or security for money due them from plaintiff, he, on April 19, 1932, assigned to Rippey & Kingsland as security his rights in the patents issued to him and in applications then pending. This indebtedness, as stated in the assignment, totaled upwards of $16,000. This assignment recited the then pendency of negotiations with Norge Corporation for a license agreement and that in event there was .perfected an agreement providing for a minimum royalty of $10,000 per year the pledged property was to be released to Wilson, otherwise the pledged property might be sold after the expiration of 60 days from date of the assignment. The above reference to a license contract is obviously a reference to the modification of the original contract agreement of which plaintiff seeks cancellation. It was only four days prior to the date of this assignment that plaintiff, Rippey, the president of Norge Corporation and its attorney had met in Chicago in an attempt to agree upon some modification of the existing royalty agreement. As a part of the original agreement Norge Corporation had advanced to plaintiff $40,000 with which to secure the interest in the Wilson patents then held by the National Pump & Compressor Company. To reimburse itself Norge Corporation retained $4,000 out of the $10,000 otherwise annually due to plaintiff as minimum royalties. At the date of the modified agreement there was still to be repaid to Norge Company about $34,400. At the Chicago meeting Norge Corporation, through its president, demanded a reduction of royalties from 90 cents to 10 cents per unit, but it was understood that the above item of $34,400 would be considered canceled and all royalties due .plaintiff considered paid to date. The attempt to reach an agreement at

the Chicago meeting failed, seemingly due to 'a difference of opinion as to what protection, if any, was afforded Norge Corporation by plaintiff's patents. Plaintiff testified that shortly after the Chicago conference Rippey "suggested that if he were in my place that he would sue the Norge Company for that amount ($180,000)." Within a few days plaintiff went to Detroit and on the 11th day of May, 1932, as a result of a conference with the president of the Norge Corporation, entered into the agreement which modified his former contract and reduced royalties from 90 cents to 10 cents per unit. This modified agreement also provided that plaintiff should be released from his obligation to reimburse Norge Corporation for the $34,400 above mentioned, and further that plaintiff acknowledge payment in full to date of royalties due to him from defendant. Plaintiff did this in the absence of his own counsel and apparently without their knowledge until after the modified agreement was executed. It is plaintiff's claim that he was coerced into making this later agreement because of the 60-day provision in the assignment of his patents which he had made to secure the amount due the St. Louis attorneys, and also by reason of the fact that the Norge Corporation had withheld payment of large sums of money due him as royalty; that these circumstances put plaintiff in a condition of financial embarrassment which compelled him to comply with the demands of the Norge Corporation. It is in consequence of such facts and circumstances that plaintiff alleges the modification of his royalty contract was obtained through conspiracy and duress.

In addition to the above plaintiff complains that in August, 1932, the St. Louis attorneys brought suit in the circuit court of Wayne county, Michigan,

to recover the amount for which plaintiff herein was indebted to them; and in connection with that suit made the Norge Corporation a garnishee defendant and by so doing further prevented plaintiff. herein from obtaining payments on his royalty contract. We think there is no justification for a claim that the bringing of this suit by the St. Louis attorneys in which they subsequently recover a substantial judgment against Wilson in any way tends to sustain plaintiff's claim in the instant case that his execution of the modification of his royalty agreement was brought about by either conspiracy or duress between Rippey & Kingsland and the Norge Corporation. In this connection it may be noted that the garnishment proceedings were not instituted until substantially three months after Wilson had signed the agreement which in the instant suit he seeks to have canceled.

We forego further details of the testimony or of inferences which plaintiff seeks to draw. Careful consideration of this record satisfies us that plaintiff's claim that he entered into the agreement of May 11, 1932, in consequence of the alleged conspiracy or duress cannot be sustained.

The remaining question is whether plaintiff was induced by fraud, perpetrated by defendant, to enter into the agreement of May 11, 1932. Stripped of many inconsequential details it may be said that plaintiff's claim of fraud is based on his contention that prior to the consummation of the contract of May 11, 1932, Norge Corporation fraudulently concealed from him the extent to which it had used his device, and by so doing concealed from plaintiff the amount of the royalties he was entitled to be paid by defendant. It is plaintiff's claim that as a result of such concealment, Wilson entered into the con-

tract of May 11th under the belief that he was indebted to the Norge Corporation to the extent of approximately $34,500, whereas as a matter of fact if the full amount of the royalties had been disclosed it would have revealed that such indebtedness was canceled and that the defendant company owed plaintiff an amount in excess of $45,000. The alleged fraud is denied by defendant and in its behalf it is contended that accurate reports were made to plaintiff of the number of units in which his invention was used, that the accruing royalties were less in amount than the minimum provided in the contract, and that the minimum annuities were paid.

There is no controversy about the minimum royalties having been paid, but the record discloses that for a considerable time prior to May 11, 1932, there was a definite controversy between these parties as to whether the Norge Corporation had reported to Wilson the full number of units in which his device was used. Defendant changed the model of its compressors and it contended that the unit it was then making was not covered by Wilson's patents. Much correspondence passed between the parties and their attorneys in which their conflicting contentions were detailed. In appellant's brief this is referred to as "the fake dispute concocted by Norge relative to its liability to pay royalties." Our review of this record brings the conviction that there was an honest controversy between these parties. Mr. Wilson's patents pertained to compressors having a telescopic rotor. Norge Corporation through its engineers developed a so-called non-telescopic rotor which had fewer working parts, operated with less power and was less expensive to manufacture. The controversy was whether the Norge structure was within the Wilson patents. Mr. Wilson and his attorneys

contended that his patents and the re-issues read on the Norge compressor. Norge and its attorneys contended that they did not. But there was no misrepresentation or fraud in this regard. Each party set forth the claims at length and they were well understood by both. As early as October, 1930, plaintiff was definitely informed by defendant that it was reporting only those units in which the so-called telescopic rotor was used. There was no fraudulent concealment. The parties honestly disagreed, and each was fully cognizant of the other's contention. It was this situation which led to the proposal of a modified agreement.

Unquestionably Mr. Wilson knew before the May 11th agreement that in event he was right in his contention that the compressor then being made by Norge Corporation was within his license agreement, he was entitled to be paid a large sum in excess of the minimum royalties he had received. And he also knew that if the contrary contention of Norge Corporation were correct he was not entitled to such additional royalties and that instead he was indebted for upwards of $34,000 to Norge Corporation. This controversy was settled by the May 11th agreement.

Appellant complains of the trial judge's refusal to receive expert testimony as to whether or not the compressors manufactured by defendant came within plaintiff's patents. There is sufficient testimony in the record to disclose that in this particular a close and perplexing question was presented. However, the issue of plaintiff's right to cancellation in the instant case does not turn upon whether defendant's compressors came within plaintiff's patents, but rather upon the question of whether there was an honest difference of opinion and an honest con-

troversy in consequence of which the modified agreement of May 11th was consummated. In this connection it may be noted that defendant has not questioned the validity of plaintiff's patents. As a licensee under plaintiff it could not do so. *Westinghouse Electric & Manfg. Co.* v. *Formica Insulation Co.*, 266 U. S. 342 (45 Sup. Ct. 117); *Thomson Spot Welder Co.* v. *Oldberg Manfg. Co.*, 234 Mich. 317.

The original royalty contract, which defendant was insisting should be modified, was subject to cancellation by Norge Corporation upon a year's notice. The negotiations which led up to the amended contract contemplated that plaintiff should receive a royalty on each of the compressors then being manufactured by defendant. While this provision was not embodied in the amended contract as executed, the contract has been so construed by the parties. The disclosure of Norge Corporation was made on this basis in the garnishment proceedings hereinbefore noted. By plaintiff's assignment of his patents to Rippey & Kingsland (a matter with which Norge Corporation had nothing to do) he had placed himself in a position which necessitated consummation by him of the then contemplated modified contract with Norge Corporation within a 60-day period or, in the alternative, risk the loss of all his patents by sale under the assignment held by Rippey & Kingsland. That this was a very persuasive circumstance which induced plaintiff to enter into the modified contract is shown by his own testimony. The circuit judge interrogated him and he testified as follows:

"I had begun to fear that I was in real danger of losing my patents. And that was the only reason for my signing this contract. * * *

"*The Court:* Did Rippey ever urge you to sign that contract?

"*A.* No. The only urgency I was under was the fact—

"*The Court:* That you were fearful it had taken your patents away?

"*A.* Yes, sir; and sell them.

"*The Court:* And your contract wouldn't be any good to anybody?

"*A.* No, I wouldn't have anything."

We think the record discloses that the circumstances just above stated by plaintiff, together with the fact that there was a genuine controversy as to whether defendant's compressors embodied any device covered by plaintiff's patents, and the further fact that the royalty contract was subject to cancellation, constituted the reasons in consequence of which plaintiff agreed to a modification of the contract. Under all the disclosed contentious circumstances it cannot be said that the modification of the contract was unconscionable, as is contended by appellant. Subsequent to the execution of the modified contract, Mr. Wilson in litigation to which he was a party has taken the position that the contract of May 11, 1932, was valid. This record does not sustain plaintiff's contention that he was induced to sign the modified contract of May 11, 1932, through duress chargeable against defendant or through fraud perpetrated upon him by defendant.

It seems unnecessary to review in further detail the voluminous record and briefs presented on this appeal. We are of the opinion that the right result was reached in the trial court. The decree entered is affirmed, with costs to appellee.

FEAD, C. J., and WIEST, BUTZEL, BUSHNELL, SHARPE, POTTER, and CHANDLER, JJ., concurred.