**Edward E. GARLAND, Plaintiff,**

v.

**REMINGTON ARMS COMPANY, Inc., Defendant.**

**Civ. A. No. 79–148.**

United States District Court
S. D. New York.

Jan. 4, 1956.

John H. Glaccum, New York City, for plaintiff.

Charles H. Walker, New York City, for defendant.

RICE, District Judge.

Plaintiff, Edward E. Garland, hereinafter referred to as Garland, is a skeet shooter of national and international renown. He has participated in a large number of skeet shooting competitions and has won several championships. In these shoots either a slide action pump gun or Remington's Model 11 Browning Automatic was used. The Model 11 Automatic was objectionable to Garland and other skeet shooters because the rear of the receiver extended considerably above the stock and interfered with the sighting of the gun. In order to remedy this defect, Garland undertook to modify the Remington Model 11, which was covered by Browning patent No. 659,507, and which had been on the market since 1905.

Garland's purpose was to eliminate the hump at the junction of the receiver and give the new gun a streamlined appearance similar to that of the slide action pump guns. Garland succeeded in making a streamlined automatic shotgun, and at that time there were no commercially available streamlined automatic shotguns. He first showed his

new gun at the Tulsa (Oklahoma) shoot in September, 1938, where it attracted much attention and favorable comment. After applying for a patent, October 5, 1938, he showed his gun to several possible manufacturers, including Remington, resulting in the license agreement involved in this suit. The agreement was entered into December 26, 1939. A patent was issued by the Patent Office February 6, 1940.

The license agreement granted to Remington the exclusive right to manufacture and sell "new guns embodying the invention described in the specifications or covered by one or more claims." A cash consideration of $4,000 was paid. In addition a royalty of 25 cents per gun was agreed upon, with a provision for a minimum sum in lieu of royalties, and a further provision that at any time after June 1, 1942, Remington might, upon written notice, make the license nonexclusive, in which event the minimum royalty provision would cease and terminate. Garland, then, was to have the right to grant licenses to others.

Remington, by a letter dated May 18, 1945, notified Garland of its decision to make the license nonexclusive effective July 1, 1945. Prior to July 1, 1945, Remington, due to war conditions, had not manufactured any new guns but had paid all minimum royalties due under the terms of the agreement. The license agreement is still in effect, but Remington has paid no royalties since July 1, 1945. Garland has made no agreements with other manufacturers, although he had the right to do so.

Remington was interested in streamlining an automatic shotgun as early as 1934 and engaged David M. Williams to design such a gun. Williams designed such a gun and obtained patent No. 2,-144,951 issued January 24, 1939. In 1938 another streamlined automatic shotgun was developed by Remington known as Ilion Model 850. After considering all three of the foregoing models, Remington rejected each because of high manufacturing costs. This decision was made prior to terminating the exclusive feature of the Garland agreement.

Thereafter Remington designed and began the manufacture of the gun in question, referred to in the evidence as Remington Model 11-48. This gun was developed and designed by L. R. Crittendon, an engineer furnished by DuPont, owner of a substantial interest in Remington. Crittendon's commission was not only to design a streamlined automatic shotgun but to design a firing mechanism that would fit any gauge shotgun and that could be used in rifles and pump guns. One of his primary objectives was to reduce the cost of manufacturing guns. As a result of his research Crittendon applied for and was granted two patents, the property of Remington, and which are the basis of the accused gun.

Remington admits that it has manufactured and sold, prior to August 31, 1955, 514,561 Model 11-48 autoloading shotguns.

Garland contends that the new gun embodies the invention described in his patent and that he is entitled to a royalty of 25 cents on each gun sold. Remington contends that its gun is not covered by the Garland patent.

At the beginning of the trial, counsel agreed that the issue was one of coverage or noncoverage. There is no dispute as to the number of guns sold or the amount of royalty in event of coverage. If the accused gun is not covered by his patent, Garland concedes he is not entitled to royalty. Counsel also agreed that Remington is estopped to deny the validity of Garland's patent.

Counsel also agreed that only Claim 3 of Garland's patent is involved. Claim 3 is as follows:

"In automatic firearm mechanism, a receiver having a cavity therein, a stock having its front end fitted to the rearward end of said receiver with its upper surface curving from substantially the top of said receiver smoothly and gradually downwardly to the small of the stock, a hammer mounted within

said receiver and movable between cocked position and firing position, a sear located within said receiver forwardly of said stock's front end for holding said hammer in cocked position, a trigger located rearwardly of the stock's front end, means interengaged between said trigger and sear for transmitting movement of the rearwardly located trigger to the forwardly located sear to release said hammer from restraint by said sear, and a single spring operating both to bias said sear toward hammer restraining position and to return said trigger and said means interengaged between it and said sear from firing position to cocked position."

The issue appeared to be simple, since counsel agreed that the validity of the patent could not be questioned and that only one claim was involved. It was not a suit for infringement, just a suit for accounting, depending upon coverage or noncoverage. But as the trial progressed, and almost from the beginning, it became complicated and rather technical to one not accustomed to patent law, but intensely interesting. The parties were not in agreement on how Remington could establish noncoverage.

■ The first legal question of any difficulty was whether or not a licensee, estopped to deny validity, may resort to prior art to establish noncoverage. Evidence of prior art was permitted over the objection of plaintiff, who based his objection upon the proposition that such evidence was in effect an attack upon the validity of his client's patent. At the time that appeared to me to be the effect. But since conclusion of the trial, after carefully reviewing the record including all exhibits and after examining the numerous authorities presented by the attorneys in their briefs, I have reached the conclusion that such evidence was proper and that prior art may be used, by a licensee, for the purpose of construing the claims of a patent, even though such evidence may reduce the patent to naught.[1]

■ The construction of a patent varies with the status of a patent. A pioneer patent is entitled to a broad construction, whereas a patent which represents a detail in a crowded art is to be strictly construed and confined to the language of the claim.[2]

Garland was not a pioneer in the field of automatic shotguns. Browning was the pioneer in this field. The firing mechanism is that part of the gun to which such patents relate. Since Browning, and before either Garland or Crittendon, there were Williams January 24, 1939, Norman July 26, 1927, and Reising November 18, 1919. The mechanism of all these patents was explained in minute detail by qualified engineers disclosing the method of operation of each, and pointing out the differences and similarities. It would serve no purpose for me to attempt to detail the construction and operation of the various mechanisms other than to say that, in my judgment, the basic principles are found in the original Browning patent. I do not mean, by this, to say that none of the other patents do not include novel contributions warranting a patent. The validity of none of the patents is involved here.

We ultimately come to the question: How much of Claim 3 of the Garland patent remains when subjected to a com-

1. Scott Paper Co. v. Marcalus Mfg. Co., 326 U.S. 249, 66 S.Ct. 101, 90 L.Ed. 47; Cold Metal Products Co. v. Crucible Steel Co., D.C.D.N.J.1954, 126 F.Supp. 546, 548–549; Timken-Detroit Axle Co. v. Alma Motor Co., 3 Cir., 163 F.2d 190; Westinghouse Electric & Manufacturing Co. v. Formica Insulation Co., 266 U.S. 342, 45 S.Ct. 117, 69 L.Ed. 316; Exhibit Supply Co. v. Ace Patents Corp., 315 U.S. 126, 136–137, 62 S.Ct. 513, 86 L.Ed. 736.

2. Lewis v. Merritt, Chapman & Scott Corporation, 2 Cir., 12 F.2d 345, 346; Haynes Stellite Co. v. Osage Metal Co., 10 Cir., 110 F.2d 11, 12; Duff v. Sterling Pump Co., 107 U.S. 636–639, 2 S.Ct. 487, 27 L.Ed. 517; Cuno Engineering Corp. v. Meehl, 2 Cir., 113 F.2d 862–863.

parison with the prior art? I do not understand that any claim is made by reason of the streamlined appearance of the Garland gun. Stated another way: Does the new gun, Model 11–48 based upon the two Crittendon patents, infringe Claim 3 of Garland's patent?

Garland's Claim 3 was twice rejected by the Patent Office, once on the Norman patent and once on the Reising patent. In presenting his claim Garland said:

"As described in the instant specification, applicant's goal was the production of a streamlined type of gun *while still utilizing automatic mechanism the efficiency and reliability of which has been established by its use over a period of almost forty years. Because of the satisfactory history of this automatic mechanism applicant desired to leave its essential operating mechanism unchanged* and merely to make such improvements as would enable him to improve the shape of the gun so that it would cease to be awkward." (Ex. LL, p. 29.)

" * * * I had always preferred the action of the Browning automatic shotgun to either the double barreled type or the pump gun. I finally developed the construction disclosed in my application Serial No. 233,398 which very greatly improves the feel of the automatic shotgun *while preserving unchanged the heart of the time-tested Browning automatic mechanism."* (Ex. LL, p. 42.)

The claim was finally allowed after the trigger was placed entirely behind the front end of the stock.

■ The proceedings before the Patent Office, and his amendments to his Claim 3 in order to overcome Norman and Reising, show that the location of the trigger in the Garland patent was a material element of Claim 3. The only element in Claim 3 that was not disclosed in the Reising patent was the location of the trigger. Garland may not ask the Court to ignore the limita-

tion which was a condition of the grant of the patent. Exhibit Supply Co. v. Ace Patents Corp., 315 U.S. 126, 136–137, 62 S.Ct. 513, 86 L.Ed. 736.

The final contention of Remington is that, when Garland's patent is construed in the light of prior art, in the same field, there is nothing novel or patentable under Claim 3 except the location of the trigger. With this I agree.

There was a conflict in the testimony as to the location of the trigger on Remington Model 11–48. My conclusion from the testimony is that the trigger on Model 11–48 is in front of the front end of the stock.

■ The Remington gun Model 11–48 does not infringe Garland, or, to use the language of the pleadings, Remington's gun is not covered by Garland's patent.