**GWYNN et al. v. RANCO, Inc.**

No. 1222.

District Court, S. D. Ohio, E. D.

Dec. 26, 1940.

William S. Babcock, of Columbus, Ohio, Solicitor for Plaintiffs, William M. Cushman, John W. Malley, and Cushman, Darby & Cushman, all of Washington, D. C., of Counsel, for plaintiffs.

Warren H. F. Schmieding, of Columbus, Ohio, Solicitor for Defendant, Webb I. Vorys, of Columbus, Ohio, of Counsel, for defendant.

NEVIN, District Judge.

This is a suit under the patent laws of the United States. The patent in suit is No. 2,009,549 issued on July 30, 1935 to William A. Gwynn, St. Louis, Missouri, on application filed December 12, 1932. It is for a "Vulcanizing Device."

Plaintiffs filed their bill of complaint on November 19, 1937, charging infringement by defendant, an Ohio corporation located at Columbus, Ohio. They pray for an injunction; an accounting, and for costs.

On April 9, 1938, defendant filed an answer denying infringement and averring that the letters patent in suit were and are invalid and void for the reasons set forth in the answer, among others, for lack of patentable novelty and invention over the prior art, as disclosed in certain U.S. letters patent and printed publications referred to in the answer; because every material and substantial part claimed to be new had been known or publicly used by others more than two years prior to the effective date of the application; because the patentee so limited his claims, while his application was pending in the Patent Office, as that he cannot now seek or obtain a construction of the claims sufficiently broad to cover any vulcanizing device made, used or sold by defendant, and because "the art relating to vulcanizing devices at the time of patentee's alleged invention was such that patentee's said alleged invention or discovery, if any existed, was extremely narrow and trivial in its nature,, and while the patentee delayed the issuance of Letters Patent in suit for said alleged invention, others schooled in the art without knowledge of patentee's alleged invention were designing, preparing to make, and making, such vulcanizing devices, and that patentee thereupon attempted to broaden the language of the claims of his application for Letters Patent in suit so as to cover the articles and things thus independently designed by others schooled in the art." Defendant prays for dismissal of the bill and for its costs.

A stipulation entered into by the parties was filed on April 9, 1940, in which it is stipulated, inter alia, "That the plaintiffs have title to the patent in suit and the right to bring this action for infringement under said patent."

The cause came on for hearing on the merits on April 16, 1940. Thereafter, briefs were filed on behalf of the respective parties.

The patent contains four claims. Of these, Claim 1 is not in issue. Claims 2, 3 and 4 are in issue. They read (Ex. 13—Patent in suit) as follows: "2. A device for vulcanizing rubber valve stems to inner tubes comprising a base having an aperture therein, a block mounted on said base presenting a vulcanizing surface and having an opening therein in alignment with said aperture for receiving the valve stem, and an electrical heating unit for said vulcanizing surface mounted in said block and having an aperture coinciding with the opening therein the aggregate thickness of the block and base being such that the outer end of the valve stem, when its base is in vulcanizing position on the block, will extend through said aperture and beyond the under side of said base. 3. A device for vulcanizing rubber valve stems to inner tubes comprising a base having an aperture therein, a block mounted on said base presenting a vulcanizing surface and having an opening therein in alignment with said aperture for receiving the valve stem and an enlarged recess in its lower side, an electrical heating unit for said vulcanizing surface mounted in said recess and having an aperture coinciding with the opening in the block, and a heat insulating member also mounted in said recess and covering the side of said heating unit remote from said vulcanizing surface, the aggregate thickness of the block and base being such that the outer end of the valve stem, when its base is in vulcanizing position on the block, will extend through said aperture and beyond the under side of said base. 4. In a device for vulcanizing rubber valve stems to tubes, a member having a vulcanizing surface provided with an opening for receiving the valve stem, and an electric heating unit associated with said member and

having an opening registering with the opening in said vulcanizing surface, said heating unit being disposed to concentrate the heat over a localized area of the vulcanizing surface immediately adjacent said openings whereby to connect effectively the valve stem to the tube during the vulcanizing operation, the overall thickness of said member and said heating unit relative to the length of the valve stem being such that the valve stem extends sufficiently beyond the heating unit to avoid excessive heating of the outer end portion of the valve stem."

The Gwynn vulcanizer is a relatively small inexpensive and portable device. It is intended for repair work by garage men, small tire dealers, automobile filling stations, and operators of that type. It is not for original placement of the rubber valve stem to the tube. That is done in factories. It appears from the evidence that the rubber valve stem is comparatively recent in its development. It has largely displaced the old metal valve stem connected with the inner tube of an automobile tire.

In his patent Gwynn states that the "invention relates to vulcanizing apparatus of a construction particularly designed to enable rubber valve stems to be vulcanized in position on the inner tubes of tires" and that "It is the object of my invention * * * to provide a simple and economical vulcanizing device which will permit the proper degree of heat to be applied uniformly to all parts of the rubber base while the latter is held under pressure in contact with the inner tube, and at the same time avoid the danger of applying an objectionable degree of heat to the outer end portion of the valve stem enclosing the valve."

Plaintiffs assert that when the rubber valve stem came into use there was a need for a small portable device such as shown in the Gwynn patent, since when replacement or repair work was necessary on a rubber valve stem it had to be taken off or cut away from the inner tube, and a new rubber valve stem in its entirety vulcanized. This need was felt particularly in garages and filling stations, and small tire repair shops, and contend that the plaintiff Gwynn supplied this need by inventing the vulcanizer of the patent in suit.

Plaintiffs further assert that "The defendant has had knowledge of the Gwynn vulcanizer and the patent in suit since almost about the time that they commenced the manufacture and sale of their vulcanizer. This was due to certain negotiations that were carried on between the plaintiff Gwynn and the defendant toward a possible license arrangement under the patent in suit. Notwithstanding that no license arrangement was entered into, the defendant has continued, or did continue to manufacture and sell vulcanizers, and as we contend, in violation of the patent in suit. Furthermore, the defendant filed an application for the patent on its vulcanizer after the issuance of the Gwynn patent in suit. * * * . The defendant's vulcanizer is almost identical with the vulcanizer of the patent in suit and also the vulcanizer as manufactured and sold by Gwynn. What differences there are are inconsequential."

On the other hand, it is submitted by defendant that "This case lies within a narrow compass. The essential facts, which can be stated in a few words, demonstrate that the Gywnn patent is clearly invalid and is not infringed.

"The Gwynn patent in suit is directed to the specific use of a vulcanizer having a circular electrical heating element, well known in the vulcanizing art, for heating the vulcanizing plate having the usual hole for receiving a valve stem, to perform exactly the same function as is performed by the prior art. Viewed in another manner, the patented structure is directed to providing a hole for a valve stem, in the old electrically heated vulcanizing plate, which hole was old and familiar, located in exactly the same position, and used for exactly the same purpose in the same art.

"It was old long prior to the alleged invention of Gwynn to secure a cured rubber valve stem to a tube and to provide an electrically heated vulcanizer for exactly the same purpose.

"Patentability must rest upon novelty of means.

"The prior use of such heater and plate makes Gwynn's aggregation the boldest case of mere analogous double use, which the courts have held invariably to be unpatentable, from the Fish Refrigerator case, Brown et al. v. Piper, 91 U.S. 37 [23 L.Ed. 200] to the more recent Fly Wheel case, Altoona Publix Theatres, Inc. v. American Tri-Ergon Corp. et al., 294 U.S. 477 [55 S. Ct. 455, 79 L.Ed. 1005].

"Patentability must rest on utility.

"Aside from the lack of novelty, the patent in suit lacks utility. * * *

"Aside from the fact that the patent is invalid, the claims, when properly construed, contain material limitations which are not present in Defendant's structure.

"To sustain the validity of the Gwynn patent and hold the same infringed, would be to violate the most fundamental principles of the patent laws. The patent is clearly invalid and is not infringed."

### Validity.

Defendant claims that "The Gwynn patent describes an old and familiar vulcanizer of the electrically heated type wherein the vulcanizing block is provided with an enlarged recess in the underside for receiving the electrical circular type heater and heat insulating disks. This vulcanizing block can be used for attaching rubber valve stems to tubes by providing a hold, old and familiar in the vulcanizing art, for receiving the shank of the valve stem. The patent shows the top surface of the vulcanizing block at such height that, when the base of the valve stem rests on the top surface, the lower end of the shank of the stem does not touch the bench which supports the vulcanizer, all of which is old and familiar in the vulcanizer art and obviously necessary.

"The object proposed in the patent was to prevent the application of an objectionable heat to the outer end of the valve stem shank by extending the end thereof into the open air; * * * that everything which Gwynn alleges of value is found in the prior art; * * * that it was old, long before Gwynn entered the field, to attach a cured valve stem to a tube, * * * and to permit the end of the rubber valve stem to extend into the free air and remote from the vulcanizing surface. That was the practice of both Miller and Goodrich rubber manufacturing companies and is clearly shown in the Fenton Patent and the modified Kuhlke vulcanizer used by Goodrich; * * * and that it was old to raise the vulcanizing surface to such height that the lower end of the stem would not rest on the bench or table that supported the vulcanizer. An excellent example is: Kremer No. 1,078,097 of 1913."

Defendant asserts that in view of the prior art, plaintiffs were compelled to emphasize portability as the criterion of the patent, and that aside from the fact that portability adds no weight whatever to the validity of a patent, portable electric vulcanizers were old, citing Patent No. 1,-301,233 (1919) to Dennis and No. 1,515,177 (1924) to Seelye.

Defendant submits further that everything that Gwynn claims as new is shown in the prior art. No inventive thought was necessary. It was merely a mechanical expedient to provide a hole in Seelye et al. for receiving a protuberance, and this expedient had been adopted long ago in this particular art for exactly that purpose. Gwynn merely indicated the electric heat as well as the steam heat indicated by earlier patentees. Kremer and Kuhlke each show a vulcanizer for attaching valve stems to inner tubes by vulcanization. Seelye et al. shows precisely how an electrical heater can be substituted for the steam of Kremer or Kuhlke, i. e., it shows that a circular electric heater 13, instead of steam, can be housed in a recess in the underside of a vulcanizing block and that a circular heat insulating disk 12 can be interposed between the heating element and the base, and that Gwynn merely substituted "one well-known element for another well-known element without changing the function or result of the machine," and that this "cannot rise to the dignity of invention," citing Mast, Foos & Co. v. Stover Mfg. Co., 177 U.S. 485, 20 S.Ct. 708, 44 L.Ed. 856; Keene et al. v. New Idea Spreader Co., 6 Cir., 231 F. 701, 708, and other cases; that "Gwynn's aggregation lacks utility" and novelty, and that "Gwynn did not produce a new result and therefore the cases cited by Plaintiffs are not in point."

Defendant further asserts that "The Examiner who was skilled in the vulcanizing art knew there was no invention in the Gwynn patent and finally rejected claims 2 and 3 of the patent. The solicitor for the patentee then made deceptive statements to the Board of Appeals, stating that Oppenheimer and Ryan 'could not be used for vulcanizing rubber valve stems to tubes without serious injury to, if not absolute destruction of the rubber stem.' This misstatement led the Board of Appeals to believe that the patentee accomplished a new result," and that "In the present case any presumption of validity has been completely overcome by the proof that Gwynn's patent totally lacks utility and also by the fact that the most pertinent art was not discovered by the Patent Office," citing American Soda Fountain Co. et al. v. Sample, 3 Cir., 130 F. 145; Westinghouse Electric & Mfg. Co. v. Toledo, P. C. & L. Ry. Co., 6 Cir., 172 F.

371; Elliott & Co. v. Youngstown Car Mfg. Co., 3 Cir., 181 F. 345.

Plaintiffs submit that "The validity of the patent need not depend on the novelty of any one element employed. The invention resides in the combination of elements, which gave to the art a small, light, cheap, portable, quickly and economically operated electric vulcanizer for attaching rubber valve stems to the inner tubes of tires, so arranged that the end of the valve stem, containing the delicate rubber valve parts, cannot possibly be injured by the heat which the device generates in vulcanizing the stem to the tube," citing Forestek Plating & Mfg. Co. v. Knapp-Monarch Co., 6 Cir., 106 F.2d 554, 558; France Mfg. Co. v. Jefferson Electric Co., 6 Cir., 106 F.2d 605, 609.

They further assert that Gwynn solved the problem which was presented to the industry of devising a practical repair vulcanizer for attaching rubber valve stems, and that for roadside repair use by unskilled persons such a vulcanizer must be small, light, cheap, portable, quickly operable, and economical in the sense that the power required to bring it to vulcanizing heat must be kept at a minimum to stay within the price which can be charged for the job; that "the patent is prima facie valid," citing Westinghouse Electric & Manufacturing Co. v. Formica Insulation Co., 266 U.S. 342, 348, 45 S.Ct. 117, 69 L. Ed. 316, and that the fact that the device is simple in construction does not detract from its merit as an invention, citing Webster Loom Co. v. Higgins, 105 U.S. 580, 591, 26 L.Ed. 1177, and France Mfg. Co. v. Jefferson Electric Co., supra, and that the presumption of validity is strengthened where, as here, claims were rejected by the Examiner and then allowed on appeal. National Battery Co. v. Richardson Co., 6 Cir., 63 F.2d 289, 292; Celanese Corporation of America v. Essley Shirt Co., Inc., 2 Cir., 98 F.2d 895, 896.

Defendant asserts that "Gwynn's sale of vulcanizers was practically negligible; only 8,540 were sold by Gwynn during a period of seven years." To this plaintiffs reply that "Gwynn was successful in the sale of vulcanizers made in accordance with the patent in suit (R. p. 66). That his success was moderate is only to be expected, considering the modesty of the establishment which he operated, and the limited means and facilities he had to market the invention. It remained for others to reap the fruits of his invention. Defendant admitted the sale of 15,000 vulcanizers from 1935 up to the time of this suit (R. p. 39), and these are made in accordance with the patent in suit. The plaintiff Gwynn is entitled to the credit for the acceptance by the public of the defendant's vulcanizer, and this public acceptance is evidence of invention. Wellman-Seaver-Morgan Co. v. William Cramp & Sons Ship & Engine Bldg. Co., 6 Cir., 3 F.2d 531."

From a consideration of the claims of the respective parties and the evidence, the court is of opinion that Gwynn patent No. 2,009,549, in so far as it concerns Claims 2, 3 and 4 here in suit, is valid.

Infringement.

Plaintiffs charge, and defendant denies, infringement. It is agreed (Rec. pp. 21, 34) that Exhibit No. 1 is a sample of the alleged infringing device, and that it was manufactured and sold by defendant company.

Defendant's vulcanizer is known as the "Raney Duo-Matic." Like the device of the patent in suit, it is a small, light, cheap, portable, quickly and economically operated vulcanizer for attaching rubber valve stems to inner tubes. It retailed for about $8.50.

Defendant urges that "There are material distinctions between Defendant's structure and that shown in the Gwynn patent, which are sufficient to remove Defendant's structure from the scope of the Gwynn claims," and that "the claims of the Gwynn Patent must be confined to very narrow limits." Counsel for defendant point out in their briefs the distinctions which they assert exist and which they contend distinguishes defendant's structure from that of the patent in suit.

The court is of the opinion, however, that, as claimed by plaintiffs, the accused device embodies all of the essential elements claimed in the patent in suit. (Exhibit 9 is a copy of Patent No. 2,099,499 issued November 16, 1937, to Estel C. Raney —vice-president and general manager (Rec. p. 175) of defendant company—and by him assigned to defendant. For convenient reference and comparison see particularly figures 1, 2 and 9 of Patent No. 2,099,499).

Defendant's accused device does the same work in substantially the same way, and accomplishes substantially the same result as the device of the Gwynn patent, "and this is infringement." Cleveland

Automatic Machine Co. v. National Acme Co., 6 Cir., 52 F.2d 769, 772; E. H. Bardes Range & Foundry Co. v. American Engineering Co., 6 Cir., 109 F.2d 696, 698; Stubnitz-Greene Spring Corporation v. Fort Pitt Bedding Co., 6 Cir., 110 F.2d 192, 198.

There is evidence also, at least tending to show, that the officials of the defendant company were themselves not always free from doubt on the question of infringement.

The record shows that since about 1933 plaintiff Gwynn has manufactured and sold portable vulcanizing devices built in accordance with the patent in suit, but that his manufacturing facilities are small, and his means limited. It further shows that at about the time defendant undertook the manufacture and sale of the infringing device in 1935, it negotiated with the plaintiff Gwynn toward securing a license under the patent in suit. There were conferences and an exchange of letters between the officers of the defendant company and the plaintiff Gwynn. Subsequently, the attorney for the Receiver of Plaintiff, Mutual Loan & Investment Company, wrote defendant with respect to resuming negotiations to obtain a license (Exhibits 3–3L and 4–4D, Rec. pp. 23, 24, 27, 28). While nothing came of these negotiations and defendant ultimately stated it was not interested, nevertheless, the testimony regarding them throws some light on the views then held by the officers of defendant company.

As to these matters, Mr. Raney testified (Rec. pp. 41, 42, 43) in part as follows:

"Q. 55. Do you know Mr. William A. Gwynn of St. Louis one of the plaintiffs in this suit? A. Yes, sir.

"Q. 56. Did you have any negotiations with Mr. Gwynn concerning the Patent in suit, 2009549? A. Yes, we had some negotiations.

"Q. 57. How did these negotiations commence? A. I don't recall the details.

"Q. 58. Did you call him by long distance telephone late in August or early in September 1935, about his patent 2009549, the patent in suit? A. I may, I don't recall.

"Q. 59. Did you personally visit in St. Louis with Mr. Gwynn about his patent, the patent in suit? A. Yes, sir. * * *

"Q. 65. When did you first see one of Mr. Gwynn's vulcanizers for rubber valve stems such as shown in the patent in suit? A. At the time that I called on him at St. Louis.

"Q. 66. After you went to St. Louis to visit Mr. Gwynn, did you or any one else of the defendant company further negotiate with Mr. Gwynn? A. I think there was some further negotiations on the subject.

"Q. 67. Do you recall the nature of these negotiations? A. Not too clearly. As I recall they were negotiations regarding the taking out of a license, and also at the same time we were investigating the validity of the patent, and the art relating to vulcanizers, to determine whether or not he had a valid patent that we would be justified in paying royalties under. We finally decided that our device was not an infringement, or if it was, that the patent was not valid and did not justify us taking license." See also testimony (Rec. pp. 50–52) of Mr. Robert Dunlop who likewise was an officer of defendant company.

The court is of the opinion—and so finds—that the device of defendant, as exemplified by Exhibit No. 1, is an infringement of the patent in suit.

It appears from the record that after manufacturing about 15,000 vulcanizers similar to Exhibit No. 1, defendant discontinued making them. As to this Mr. Raney testified (Rec. p. 39):

"Q. 40. Has Ranco, Inc., the defendant, discontinued the manufacture of vulcanizing devices similar to plaintiffs' Exhibit 1? A. Yes, sir.

"Q. 41. Does the defendant, Ranco, Inc., make any type of vulcanizing device? A. No, sir.

"Q. 42. Referring to plaintiffs' Exhibit 1, which is defendant's vulcanizer, how many of these devices did Ranco, Inc., and the Automatic Reclosing Circuit Breaker Company manufacture before they discontinued making this device or any type of vulcanizer? A. Which model do you refer to?

"Q. 43. Plaintiffs' Exhibit 1. A. My guess would be about ten to fifteen thousand." This testimony is not contradicted.

Just when defendant ceased to manufacture the infringing device is not clear. The testimony of Mr. Raney (Rec. pp. 34, 35) is as follows:

"Q. 8. Did the defendant, Ranco, Inc., subsequent to July 30, 1935 and prior to the commencement of this suit, November 19, 1937, make, use or sell a vulcanizing device known as the Raney Duo-Matic Vulcanizer

as disclosed by the device filed with the clerk of the court as plaintiffs' Exhibit No. 1 which I show you herewith? A. We made that device. I am not sure of the date that the manufacture was started from memory.

"Q. 9. Well, this is between the dates that I am interested in, that is, between July 30, 1935 and November 19, 1937? A. Yes, we manufactured it between those dates. I am not certain from memory what date manufacture was started.

"Q. 10. (By Mr. Malley): Well, you are sure you were manufacturing it during that period? A. Yes, sir. * * *

"Q. 13. Did the defendant, subsequent to July, 1935, and prior to the commencement of this suit, that is November 19, 1937, make, use or sell a vulcanizing device as disclosed in Raney Patent 2099499 referred to in the preceding question, including a shoe plate 63, as shown in figures 1, 2 and 9 of said patent, having an opening there through to receive an inner tube valve stem? A. Yes, sir."

The court is unable to determine from the foregoing testimony (which is all there seems to be in the record on this particular point) just when it was that the defendant company discontinued making the type of vulcanizer here in question. As indicated, the question asked of Mr. Raney was whether defendant had manufactured the device "between" certain dates, and he answered, that it had.

All that is said in the briefs touching the question of manufacture and sale by defendant of the accused device is found in "Plaintiffs' Trial Brief" (filed March 29, 1940) at page 15, where it is stated "Plaintiffs have suffered great damage by reason of defendant's willful manufacture and sale of its vulcanizer in violation of the patent in suit, and while it is now asserted by the defendant that it has discontinued manufacture and sale of its vulcanizing devices, nevertheless the damage and loss of trade to the plaintiffs has already been accomplished and plaintiffs should be justly compensated for the inequitable actions of defendant and granted an injunction against further abuse of their rights."

▮ Where no infringement exists at the time suit is filed and none is threatened, injunction is not an appropriate remedy. Hamilton Standard Propeller Co. v. Fay-Egan Mfg. Co., 6 Cir., 101 F.2d 614, 615; Kennicott Water Softener Co. v. Bain, 7

Cir., 185 F. 520; Munger Laundry Co. v. National Marking Machine Co., 8 Cir., 252 F. 144. In the instant case, however, since counsel make no point of the matter, the court assumes (from such evidence as has been presented) that manufacture and sale by defendant company continued until and after this suit was filed, and that it may be the intent of defendant to resume so doing at some future time.

Upon a consideration of all the evidence, the arguments of counsel, and the applicable law, the court has arrived at the following:

### Findings of Fact.

1. This is an action for infringement of claims 2, 3, and 4 of patent 2,009,549, granted July 30, 1935, to the plaintiff William A. Gwynn, of St. Louis, Missouri, for a vulcanizing device.

2. Plaintiffs are the patentee William A. Gwynn, doing business in St. Louis, Missouri, as Chase Manufacturing Company and Mutual Loan and Investment Company, and T. H. Humphries, Jr., its receiver, both of Little Rock, Arkansas.

3. Plaintiffs have title to the patent in suit, and the right to bring this action for infringement.

4. Defendant is Ranco, Inc., an Ohio corporation, having its principal place of business at Columbus, Ohio.

5. Defendant's vulcanizer, known as the "Raney Duo-Matic", which is alleged to infringe the patent in suit, was manufactured and sold by defendant subsequent to the issuance of the patent in suit and to and including the date of the filing of this action.

6. The invention of the patent in suit is a small, light, cheap, portable, quickly and economically operated electric vulcanizer for attaching rubber valve stems to the inner tubes of tires. It is sold retail by the plaintiff Gwynn and the Chase Manufacturing Company for about $8.50. It is intended for use in roadside filling stations, garages, and repair shops, where it is necessary to perform a quick and cheap job of repair when the emergency arises. Roadside repair shops which use vulcanizers of the type of the patent in suit charge approximately 50 cents for vulcanizing the rubber stem to the tube.

7. The vulcanizer of the patent in suit comprises a base; a block or housing mounted on the base having an upper vulcanizing surface; a central vertical opening

extending through the block to receive the rubber valve stem; a recess in the lower side of the block to receive a circular electric heating element which extends around the opening through the block, the total thickness of the block and base being such that the end of the valve stem containing the valve parts or core, when in vulcanizing position, extends beyond or below the heating coil, and beyond the underside of the block and base.

8. In attaching rubber valve stems to inner tubes with such a vulcanizer, the rubber stem is inserted downwardly through the opening in the block with the base of the stem resting on the vulcanizing surface of the block. The inner tube, one ply of which is provided with an opening registering with the opening through the valve stem, is then positioned on the vulcanizing surface on top of the base of the stem. Thereafter, a suitable mechanical pressure applying plate is operated to clamp the tube and the base of the stem against the vulcanizing surface, and electric current is turned into the heating coil to generate the necessary heat to effect vulcanization of the base of the stem to the tube. A heat of approximately 300° F., more or less, applied for from approximately seven to twelve minutes, is required to effect a satisfactory union of the stem and tube.

9. From the specification of the patent in suit it is evident that Gwynn foresaw the danger of damage to the end of a rubber valve stem, including the valve parts or core, by over-vulcanization incident to the performance of the repair job of attaching the rubber valve stem to the inner tube. To avoid any damage to the end of the stem and the valve parts, he designed the vulcanizer of the patent in suit so that the end of the valve stem protruded beyond or below the electric heating coil, and below the housing or block which contains said coil, into the open air. By this arrangement, the end of the valve stem containing the core is so positioned that there is little possibility of the intense heat of the electric coil injuriously affecting the rubber composition of the valve parts.

10. The conventional rubber valve stem has a metal insert adjacent the outer end thereof which receives a removable valve core. The valve core comprises a barrel having a relatively small outside sleeve of rubber to seal with the metal wall of the insert when the core is attached therein, and also a relatively small rubber cup portion which constitutes a seat for the valve proper.

11. These rubber parts of the valve core are manufactured, like other rubber articles, by processes including original vulcanization or cure. Like other articles of rubber composition, these parts are originally cured by subjecting them to heat at a selected temperature for a selected period of time to best adapt the rubber composition from which they are formed to the use to which the article is to be put. Original vulcanization or cure of rubber articles is such that their qualities for performance are increased to the maximum. It is well known that when rubber articles are cured for a predetermined period of time, the process enhances the physical qualities of the rubber composition for its intended service, but thereafter, further cure does not enhance the properties of the rubber composition to any appreciable extent. It is also well known that further and prolonged vulcanization or cure will deteriorate the qualities of the rubber composition for service use. Therefore, in the rubber industry, it is the practice to originally vulcanize or cure articles of rubber composition up to a certain point only, the desired point being that at which improvement in the rubber ceases. This point is known in the industry as that of "optimum" cure. When rubber composition is cured to the optimum, care is exercised to then immediately discontinue the cure. After the optimum, there is a period when further cure will not appreciably either improve or deteriorate the rubber composition. This period, when there is no appreciable improvement or deterioration, is known as the "plateau" effect of cure, and it provides a margin of safety of the rubber composition in its intended commercial use, before any deterioration will set in, due to the service conditions to which it may be subjected. In order to preserve this margin of safety, it is the practice in the industry to discontinue the cure as close to the optimum as possible, so as to leave the rubber composition in such state that the margin of safety against the effect of service conditions to which it may be subjected, is at a maximum. Over-vulcanization is the subjecting of rubber after or during initial cure to a further heat treatment which will tend to reduce the margin of safety of the rubber for its intended use. Over-vulcanization may be caused by subjecting the article to a further heat treatment, approxi-

mately that of the original cure, above that of the original cure, or even at a temperature below that of the original cure. In vulcanizing rubber valve stems to inner tubes, a heat of temperatures approximately that of original cure of the valve parts is employed, and if the rubber parts of the valve core are subjected to this heat incident to attaching a rubber valve stem to an inner tube, the margin of safety preserved in the rubber parts by curing them only to their optimum during original vulcanization, is reduced.

12. In the use of the vulcanizer of the patent in suit, by reason of the fact that the end of the valve stem extends beyond the electric heating coil and into the open air, there is little possibility of sufficient heat being applied to the end of the valve stem, including the valve core, which would reduce the margin of safety preserved in the rubber parts of the core at original cure. Thus, the vulcanizer of the patent in suit, while permitting convenient attachment of the base of the valve stem to the inner tube, substantially precludes the possibility of injury to the valve core, which injury might cause leaks through the valve stem.

13. Shortly after the plaintiff Gwynn developed the vulcanizer of the patent in suit, he marketed vulcanizers made in accordance therewith, and had a moderate success in their sale, commensurate with the modesty of the establishment which he operated.

14. Approximately three years later, in 1935, the defendant developed and commenced the sale of its vulcanizer, and from 1935 up to the institution of this suit, defendant sold approximately 15,000 vulcanizers of the "Raney Duo-Matic" type.

15. Defendant's "Raney Duo-Matic" vulcanizer, shown in the Raney patent 2,099,499, which issued on November 16, 1937, like that of the patent in suit, is a small, light, cheap, portable, quickly and economically operated electric vulcanizer for attaching rubber valve stems to inner tubes. It is adapted for quick roadside repair work, and was retailed by defendant for approximately $8.50.

16. Defendant's vulcanizer embodies all of the elements defined in claims 2, 3, and 4 of the patent in suit, arranged in substantially the same manner as described in the specification and defined in the said claims of that patent. It comprises a base; a block or housing mounted on the base provided with an upper vulcanizing surface; a verti-

cal central opening extending through the block to receive the rubber valve stem; and a recess in the lower side of the block to receive an electrical heating coil surrounding the vertical opening for the valve stem. It is evident that the vulcanizer was designed so that the total thickness of the block and base is such that the outer end of a valve stem when in vulcanizing position, extends beyond the heating coil and beyond or below the underside of the block and base.

17. Defendant's vulcanizer is operated in substantially the same manner as that of the plaintiff's patent, and by reason of its construction, the same advantages in the protection of the end of the valve stem and the rubber of the valve core are obtained in the operation of this vulcanizer.

18. Fenton patent 1,607,885, or the use of his apparatus and method by the Miller Rubber Company, does not anticipate claims 2, 3 and 4 of the patent in suit. This patent shows a large and bulky apparatus intended only for the original manufacture and curing of brake bands, and is not adapted for the use of the device of the patent in suit. In joining a rubber stem to the uncured brake band tube in this patent, heat is applied throughout the entire mold in which the tube is placed, thus subjecting the entire brake band to heat of vulcanization, rather than concentrating the heat over a localized area, as in the case of plaintiffs' patent.

19. Kuhlke patent 1,652,366 or the use of apparatus made in accordance therewith by the B. F. Goodrich Company, does not anticipate claims 2, 3, and 4 of the patent in suit. This patent shows apparatus also intended for the original vulcanization or cure of inner tubes. The apparatus disclosed is of great bulk and weight, and not adapted for the roadside repair work for which the Gwynn device, and that of defendant, are used. In the Kuhlke apparatus, there is no localized application of heat to attach a rubber valve stem to a tube.

20. Kremer patent 1,078,097 does not anticipate claims 2, 3, and 4 of the patent in suit. This patent shows an apparatus intended for use in the older method of forming inner tubes, wherein the ends had to be spliced together, and does not relate to the problem of the Gwynn patent.

21. The patents to Oppenheimer 1,323,544 and Ryan 1,579,490 were of record during the prosecution of the application of the patent in suit before the Patent Office,

and were there overcome by Gwynn when he secured his patent. These patents do not anticipate claims 2, 3, and 4 of the patent in suit.

22. The patent to Campbell 1,587,282 was cited by the Patent Office against the application of the patent in suit, and was there overcome by the plaintiff Gwynn in securing his patent. It does not anticipate claims 2, 3, and 4 of the patent in suit.

23. The remaining patents relied on by defendant, such as Seelye 1,515,177, and other patents merely showing electric vulcanizers or electric heating devices for other purposes, do not anticipate the invention of the patent in suit, as they are incapable of vulcanizing a rubber valve stem to an inner tube, no provision being made in the patents for the accomplishment of this purpose.

24. Plaintiff was the original and first inventor of the invention of the patent in suit, as defined in claims 2, 3, and 4 thereof, and the combination defined in said claims is not present in any of the prior art relied on by defendant.

### Conclusions of Law.

1. The vulcanizer which defendant has manufactured and sold, and known as the "Raney Duo-Matic", incorporates the invention of the patent in suit (No. 2,009,-549) and constitutes an infringement of claims 2, 3, and 4 of that patent.

2. The patent in suit (No. 2,009,549), in so far as relates to claims 2, 3, and 4 thereof, is valid.

3. Plaintiffs are entitled to an injunction and an accounting as prayed for.

Counsel may prepare and submit a decree accordingly.