BECTON DICKINSON & CO.

v.

R. P. SCHERER CORP. et al.

No. 11798.

United States Court of Appeals,
Sixth Circuit.

April 6, 1954.

David S. Kane, New York City (Arthur C. Beaumont, Whittemore, Hulbert & Belknap, Detroit, Mich., on the brief; Kane, Dalsimer & Kane, Daniel H. Kane, Haynes N. Johnson, New York City, Toner, Crowley, Woelper & Vanderbilt, E. Edward Toner, John A. Ackerman, Newark, N. J., of counsel), for appellant.

Will Freeman, Chicago, Ill. (Bair, Freeman & Molinare, Chicago, Ill., on the brief; W. M. Van Sciver, Chicago, Ill., Marco & Marco, Paul Marco, Phillip Marco, Detroit, Mich., of counsel), for appellee.

Clair V. Johnson, Newfane, Vt. (Marco & Marco, Paul Marco, Detroit, Mich., on the brief; Clair V. Johnson, Newfane, Vt., Phillip Marco, Detroit, Mich., of counsel), for intervenor-appellee.

Before SIMONS, Chief Judge, and ALLEN and McALLISTER, Circuit Judges.

ALLEN, Circuit Judge.

This is an appeal from a judgment entered in a declaratory action wherein appellant prayed that Patent No. 2322245, issued to Lockhart on June 22, 1943, and Patent No. 2380534, issued to Lockhart July 31, 1945, for hypodermic injectors called "hypospray" patents be held void for fraud and that appellant's contracts with reference thereto be held null and void and rescinded and cancelled and that the court declare that appellant's needleless hypodermic devices do not infringe. It also attacked the validity of both patents. The District Court found that fraud was not proved, denied the relief sought and dismissed the action, 106 Fed.Supp. 665.

Appellant, owner of the patents in suit, manufactures hypodermic syringes and other medical and pharmaceutical equipment and appellee Scherer Corporation, herein called "Scherer," exclusive licensee of the patents in suit, manufactures gelatine capsulated medicaments and vitamins. Appellee Marshall L. Lockhart, patentee of both patents, on August 11, 1944, granted to the predecessor of Scherer an exclusive license to manufacture, use and sell the hypospray inventions. On June 7, 1947, appellant contracted to purchase Lockhart's whole right, title and interest in and to the hypospray patents, inventions and applications, subject to the outstanding license to Scherer. In the spring of 1948, appellant alleges, it learned that Lockhart was not the original inventor of the patents. It then requested Scherer to acquiesce in a disclaimer of certain claims of the first patent, but this application was declined and appellant instituted the present action

against Scherer. Lockhart intervened during the course of the trial.

The case arises out of the following facts: In 1932 Arnold K. Sutermeister, a mechanical engineer, who had noticed that jets of fluid under high pressure from Diesel engines enter a hand or arm without visibly breaking the skin, began working upon the conception of hypodermic injection without a needle and built a device for that purpose. His physician referred him to the College of Physicians and Surgeons of Columbia University, where Sutermeister met Dr. John F. Roberts, who during 1933 and 1934 cooperated with Sutermeister in building a second device for injection without a needle, experimenting with paper, live animals, and dead and living human tissue. In 1935 Roberts, as a part of his work for a medical degree, wrote a preliminary report and a final thesis describing Sutermeister's original device, the second machine, and their experiments therewith. The thesis was filed in the library at Columbia University and thus made available to the public. A physician at Columbia University introduced the idea of needleless injectors to Cambridge Instrument Company, of Ossining, N. Y., hereinafter called "Cambridge." A copy of Roberts's thesis was sent to Cambridge and assigned around the fall of 1935 to Howard Fawcett for study. Appellee Lockhart at the same time was employed as a consultant at Cambridge, where he occupied a desk in the same room as Fawcett and learned from him of the thesis and the experiments by Roberts and Sutermeister.

Fawcett says that Lockhart suggested that Cambridge was "on the wrong track" because of the "bulky apparatus." In the fall of 1935 Lockhart secured Leslie Gillett to work with him on a device which would solve the problem. Later Michael Picciano, a chemical engineer, was associated with Lockhart and Gillett and an instrument was built according to Lockhart's instructions.

Early in 1936, on his attorney's advice, Lockhart applied for a patent on this apparatus in his own name. Gillett and Picciano were angry, severed their association with Lockhart, and reported the transaction to Packard, vice president of Cambridge. Gillett and Picciano did nothing thereafter with the idea.

A number of the claims in the application for Patent No. 2322245 filed by Lockhart were repeatedly rejected by the examiner. On appeal to the Board of Patent Appeals the decision of the examiner was reversed and the patent was issued to Lockhart. Appellant contends that in securing this patent Lockhart executed a false oath and thus committed two frauds upon the Patent Office. Under Title 35 U.S.C. § 35, in effect in 1936,[1] the inventor was required to make oath "that he does verily believe himself to be the original and first inventor or discoverer of the art, machine, manufacture, composition, or improvement, or of the variety of plant, for which he solicits a patent; that he does not know and does not believe that the same was ever before known or used; and shall state of what country he is a citizen." Lockhart's oath was made in compliance with this statute. Appellant urges that Lockhart secured the basic concept of "needleless high pressure injection" from Fawcett, from Roberts's thesis, and from the work of Roberts, Sutermeister and Cambridge, and frequently claimed it as his own in prosecuting his patent application before the Patent Office. It also contends that Lockhart applied for a patent on devices to be activated by chemical reaction and explosion knowing that Gillett and Picciano were the inventors, or at least co-inventors, with him. It states that the decision in Precision Instrument Manufacturing Co. v. Automotive Maintenance Machinery Co., 324 U.S. 806, 65 S.Ct. 993, 89 L.Ed. 1381, requires it to bring this unusual action against its exclusive licensee Scherer. In that case the Supreme Court declared that the owner of a patent owes it to the public to do all within

1. Now 35 U.S.C.A. § 115.

its power to expose a fraud committed on the Patent Office.

■ On the issue of fraud, both as to the Roberts and Sutermeister and Cambridge devices and as to the claimed co-invention of Gillett and Picciano, the District Court found that fraud was not proved. This is a finding of fact and binding on this court if not clearly erroneous.

With reference to the claim that Lockhart appropriated the ideas of Roberts and Sutermeister and fraudulently claimed them as his own, the District Court pointed out that in the file wrapper of Patent No. 2322245 Lockhart and his attorneys "came dangerously close to claiming that Lockhart was giving the world the 'needleless' Hypospray injector for the first time. * * *" The file wrapper repeatedly emphasizes the fact that the device is an injector without a needle and stresses the advantage to the patient due to elimination of fear and pain which attend the use of the needle. For instance, in discussing the Doyen patent cited against Lockhart by the examiner, the file wrapper states that "To get away from this hollow needle and the pain occasioned by insertion thereof through the epidermis, applicant has devised a new method of injection, which is clearly not met by Doyen nor by any of the other references of record."

Fairly read, however, we think the file wrapper statements as to the advantages of injectors without a needle are applicable in each instance to the particular device and, as the District Court found, to the particular claim being discussed. The examiner cited no patent disclosing the needleless injector. Moreover, Lockhart's statements in the application are not limited to the needleless injector. They also stress the conception of the various means of generating the necessary pressure, such as a spring, a cartridge, or chemical reaction, and particularly emphasize the highly practical form of the device, whose structure makes possible simple and efficient sterilization, safety, interchange of medicaments, precise control of dosage, and predetermined high pressure, all of which are shown by this record not to have been secured in the devices of the prior art.

The objects of the invention described in the specification and printed in the margin stressed these advantages as well as that of the elimination of the needle.[2]

2. "My present invention relates to a hypodermic injector which does not require the use of a hollow needle to accomplish injection, this application being a continuation in part of my application Serial No. 69,119, filed March 16, 1936.

"One object of the invention is to provide a hypodermic injector of simple, durable and inexpensive construction.

"A further object is to provide a hypodermic injector which eliminates the necessity of using a hollow needle and the usual type of syringe in conjunction therewith, yet which effectively injects liquids or medicants, such as novocain, antiseptic or the like into animal tissue, leaving only a microscopic scratch on the surface of the tissue.

"More particularly, it is my object to provide a hypodermic injector containing the liquid to be injected and a charge of material which is capable of generating a predetermined high pressure within the container which exceeds approximately 30 atmospheres or 400 pounds per square inch, by suitable means, such as chemical reaction, to displace the liquid from the container through a discharge orifice, such orifice being so minute that the liquid is vaporized or atomized so finely that it can pass through animal tissue leaving holes therethrough large enough to be seen only through a microscope, thus eliminating the risk of infection, fright, pain, etc. of the usual hypodermic needle, the only feeling of the patient being the sensation of a slight breeze blowing against the skin as the injection takes place.

"Still a further object is to provide an injector for liquids, such as medicants or the like, which is capable of causing controlled hypodermic injection to any depth desirable, which is regulated by the charge of material used in the injector or the mechanism of the injector itself to provide the chemical reaction or other means for discharge of the liquid, the higher the pressure generated, the deeper the resultant injection.

"Still another object is to further regulate the depth of injection by means of

■ Also, if Lockhart's application had disclosed an apparatus substantially similar in structure, operation and function to those of the prior art, appellant would have presented a more tenable case. The fact that one feature of the device is shown to have existed in former devices in the same field is not conclusive of fraud if the circumstances taken together show that the inventor believed that his particular device was new and different from the machines which preceded it. The fact that the machines actually were different is material upon the question of fraud, for if there is a substantial difference this indicates that the device is new and that the appellant in good faith believed it to be new and different. Lockhart was presumed to have knowledge of whatever he produced that was actually first invented and constructed or used by another in the United States or was previously patented or described in a printed publication in any country after having been invented by another. Mast, Foos & Co. v. Stover Manufacturing Co., 177 U.S. 485, 494, 20 S.Ct. 708, 44 L.Ed. 856; Duer v. Corbin Cabinet Lock Co., 149 U.S. 216, 223, 13 S.Ct. 850, 37 L.Ed. 707. The needleless injector according to this record was first disclosed in Aquapuncture, a French device dating from 1866. However, Lockhart concededly derived this conception from Fawcett, Roberts and Sutermeister. The Roberts and Sutermeister machines were actually invented and constructed prior to Lockhart's machine. It follows that Lockhart was presumed to have considered the form of the devices described in Roberts's thesis.

Unquestionably substantial differences in structure, operation and result existed between the Lockhart device and the Roberts and Sutermeister unpatented machines. The findings of the District Court on this point are supported by the record. They are printed in the margin.[3]

a depth gauge on the injector which is operable to space the discharge orifice at various distances from the tissue into which the liquid is to be injected, as obviously injection occurs deeper when the discharge orifice is closer to the tissue.

"Another object is to provide a hypodermic injector wherein a predetermined and substantially instantaneous build-up of pressure may be secured for the purpose of predetermining the force of ejection of the liquid, thus securing precision control of dosage and administration of the liquid to the hypodermic location desired.

"Still a further object is to provide modifications of the invention which make it suitable from a commercial standpoint, and make it possible to provide a physician with different quantities of liquid to be injected, and to provide a readily selectable supply of injections to suit his particular needs."

3. 1. Lockhart has a small portable instrument. The Roberts-Sutermeister and Cambridge developments were heavy, unwieldy and non-portable.

2. In Lockhart's the propelling medium is within the instrument from which the medicament is suddenly forced. The others all use some outside manual compelling compressed air tank or hydraulic pumps to serve as the motivating force, which, regardless of what it might be, was not suddenly applied.

3. The Lockhart instrument can control the amount of the hypodermic injection and its depth into the flesh. The others cannot.

4. The Lockhart device has sufficient pressure at the outset of the injection so that all liquid is injected. The others have not and much (over 50 per cent) of the medicament is lost in dribbling out until the pressure builds up before it can be forced through the skin.

5. The Lockhart device is designed to have the orifice touching the skin. In the others the orifice was spaced about one centimeter from the skin and the anesthetic was "sprayed."

6. The Lockhart patent has a separate ampule which contains a sterile measured dose of medicament and the instrument can be easily sterilized. The other devices have no separate ampule and sterilization was very difficult if not impossible.

7. Using a separate ampule as Lockhart does the possibility of mixing the medicaments is entirely overcome. This feature is a hazard in the rival designs.

The Roberts and Sutermeister devices were used for the injection of anesthetic into rabbits and mice and in experiments with human skin. Each of them used anesthetic or liquid not stored within the machine and each of them relied upon a tank of compressed air or some other outside source of power. As a result, both of the Roberts and Sutermeister devices were extremely cumbersome, weighing from ten to fifteen pounds up to over one hundred pounds depending on the unit. The Lockhart device can be carried in a physician's pocket. In the first Sutermeister device a nozzle sucked up from the outside container the fluid to be injected. This machine required ten separate manual adjustments of valves for a complete sequence of operations. What Roberts called "the impracticability of this construction" made Roberts and Sutermeister work upon "a more refined form which was smaller and made entirely of non-corrosive metal. * * *" This was the second machine in which the fluid used was delivered to the small cylinder through a ball valve which opened with the suction of the up-travel of the small piston. The first machine had leather-covered parts and so it could not be efficiently sterilized by heat. While the second machine avoided this particular difficulty, it had to be taken apart to be heated in the sterilizer. Roberts testified that neither machine could be successfully used for the administration of medicaments. As Roberts pointed out in his thesis: "we were unable in these attempts to meet all the specifications of size, weight, durability in a sterilizer, ease of assembly, and efficiency which will eventually be required of an instrument for practical application. * * *. Air leaks were never entirely eliminated, and were not constant. Most important of all, the suction of the small piston did not always fill the chamber with the same amount of fluid. * * * There was not built up, therefore, the fluid pressure theoretically expected. * * *

Recognizing this possible 100% error, we obviously were unable to predict the exact penetration. * * *" The instrument was used "on a few occasions in the Out-Patient Surgical Clinic" and was purposely limited to a few occasions. As Roberts stated: "Our instrument was heavy, rather unwieldy, and defects in the filling mechanism made the pressure time consuming, and the penetration of each injection uncertain. * * * The practicability of our method, we believe, now hinges entirely on the development of a proper mechanical device. * * * The method is not applicable for hypodermic medication because of the large amount of solution wasted in the skin surface."

The same conclusion was reached by others of appellant's witnesses. Dr. Allen O. Whipple of Columbia University, Department of Surgery of the College of Physicians and Surgeons, wrote to Sutermeister June 21, 1939:

"Much as I would like to recommend the high pressure apparatus for injecting local anesthesia, which you and Dr. Roberts worked out, I feel that both the original apparatus and that which was modified under Dr. Williams' supervision carry with them too much uncertainty to make them applicable in clinical work. The difficulty in controlling the depth of penetration and the possible trauma that might result to deeper structures, such as vessels and nerves, together with the difficulties in sterilizing the apparatus, make the method too hazardous to use in the operating room."

Appellant's president stated that a device which had no needle would not be commercially acceptable if it wasted 45% of the dosage and also indicated that the device unless held still "would cut just like a scalpel." In contrast to this, appellant's able counsel, in colloquy with the court, stated that Lockhart's device "appears to have great promise."

The Cambridge machine was developed along the ideas of Roberts and Sutermeister, although with certain mechanical adaptations not necessary to describe. It used a hydraulic pump for pressure and weighed around 100 pounds. The testimony, both of Fawcett and of other Cambridge employees, with reference to the sketches of the machine indicated strongly that it was not completed until 1938. It was demonstrated at Columbia University in 1939. Dr. Whipple considered that it did not sustain the high pressure for a sufficiently long time. The office memorandum on this demonstration said that "such an apparent unevenness is unavoidable in this particular apparatus." The Cambridge device was not developed further. Since it was not shown to have been constructed at the time when Lockhart filed his application it could not have influenced him greatly.

We think the District Court correctly concluded that the differences of construction, operation and result between Lockhart, Roberts and Sutermeister and Cambridge negative a conclusion either of an effort to mislead or of any actual misleading of the Patent Office.

With reference to the claimed co-invention of Gillett and Picciano, fraud, as correctly held by the District Court, was not proved. While Gillett and Picciano each at first asserted that they had contributed important structural ideas which made the Lockhart invention successful, their later testimony contradicted these assertions. The record is replete with instances of what the District Court considered unsatisfactory testimony on behalf of the appellant, of which we shall cite only a few examples.

Before Picciano was associated with the enterprise Lockhart sketched a device showing the use of gas as a source of power, the holding back of pressure and its successful release in order to attain the "instantaneous great driving force" which was a material feature of the claimed invention. Picciano asserted this was his individual idea but it was clearly shown that Lockhart's sketch, Plaintiff's Exhibit 47, antedated any connection of Picciano with the work. The sketch, Defendant's Exhibit 56, contained a principal figure on the left side which carried out the idea of Plaintiff's Exhibit 47. Gillett claimed the entire sketch as his own. Later counsel for appellant agreed that the principal drawing, the lettering and the peculiarly notched arrows were Lockhart's and that only two small details were contributed by Gillett.

It is true that Lockhart sent his patent attorney the sketch embodied in Defendant's Exhibit 56, referring to it as the "brain storm" of Leslie Gillett and himself and said of it "we have conceived a design whereby the necessary pressure is to be generated by chemical reaction much like carbide gas in the old lamps that were used." However, appellant's counsel stipulated that Gillett contributed only a small valve structure and a mechanical detail to this sketch, neither of which was disclosed in the patent application.

The conclusion of the District Court that Lockhart was in full control of the experiments and that the whole conception was really his is supported by the sketches introduced in evidence. The first drawings dated and authenticated were Lockhart's. This is shown not only by the testimony and by the final admissions of Gillett and Picciano but by the conceded fact that Lockhart used in his drawings the peculiarly notched arrows which Gillett at one time claimed as his. These arrows were attached to the principal sketches. Gillett and Picciano in their testimony relied upon undated drawings, which they admitted had never been presented to Lockhart.

That Lockhart recognized some obligation to compensate Gillett and Picciano is shown by the fact that he instructed his patent attorneys early in 1936 to draw up an agreement between

842

himself and the two men. But this is far from requiring a conclusion that Gillett and Picciano were co-inventors. We think the District Court's finding that they were merely helpers is amply sustained, not only by the record as to the work done but also by the attendant circumstances. When Lockhart came to Cambridge he was already an inventor of standing. His successful patents other than Hypospray have yielded him substantial rewards. Gillett had no patent experience and Picciano had secured a patent for a thermometric apparatus. Picciano's idea for the use of metallic sodium to secure pressure was unsuccessful. Lockhart had stated to Fawcett in the beginning that Cambridge's idea for solving the problem was all wrong. He says that he told Fawcett that the instrument must be small, that the medicament must travel through a minute orifice at instantaneous injectable pressure, that the instrument must be easy to sterilize and must deliver a measured sterile dose. Fawcett does not deny this. The apparatus constructed worked toward these precise ends. Lockhart himself made the numerous models which were introduced in evidence, working out the various details of each structure. He was the master mind and the sole inventor.

■ Gillett and Picciano broke with Lockhart in January, 1936, after Lockhart told them he intended to apply for a patent in his own name. They were indignant, they said, because they expected a partnership and compensation for their cooperation. On the theory that the device belonged to Cambridge they reported to Packard their dealings with Lockhart, which had formerly been secret. Lockhart said that for several months he did not know this and that he endeavored to confer with Gillett, but unsuccessfully. Packard in a memorandum drawn after Gillett and Picciano interviewed him said "Lockhart has been in the habit of getting any of our good youngsters working with him at home to help him on stethographic tests

and trials and trials of new microphones, etc." While Packard expressed his indignation about Lockhart's working on this device without the knowledge of Cambridge, Lockhart offered the completed invention to Cambridge and it was not interested. We conclude that the District Court was correct in finding that there was no fraud in Lockhart's sworn statement that the invention was his own. This finding also disposes of the attack upon the second patent made on the theory that the claimed taint of fraud in the securing of the first patent carries over to the second.

■ The allegation of infringement made against the appellant was not denied. It admits in its reply that it has made and used, and is now making and using, a hypodermic injector constructed in accordance with the drawing attached to the appellant's counterclaim. This demonstrates that Lockhart's devices are infringed. The fact that the appellant is not selling them is immaterial. Walker on Patents, 6th Ed., Vol. 1, § 400; Carter Crume Co., Ltd. v. American Sales Book Co., C.C., 124 F. 903.

The question of invalidity of the Lockhart patents on the ground that they lack patentable invention, although raised in appellant's counterclaim, was not seriously contested. Scherer's expert Harrisson testified separately with reference to both patents and to the claims in issue. No other expert testimony was introduced and Harrisson's evidence was uncontradicted. Since the second Lockhart patent No. 2380534 is not vitiated by fraud its validity is conceded.

■ The District Court made careful and complete findings with reference to validity. These findings are supported by the record. The burden of proof was on appellant to establish the invalidity of the patents. Victor Talking Machine Co. v. Duplex Phonograph Co., C.C., 177 F. 248, 252; Mumm v. Jacob E. Decker and Sons, 301 U.S. 168, 57 S.Ct. 675, 81 L.Ed. 983. The Board of

Patent Appeals, which allowed the eleven claims rejected by the examiner, and the District Court saw the invention demonstrated and are particularly qualified to rule upon the existence of invention. General Motors Co. v. Swan Carburetor Co., 6 Cir., 44 F.2d 24; Williams Mfg. Co. v. United Shoe Machinery Corporation, 6 Cir., 121 F.2d 273. Each of them found patentability to exist. This is a question of fact, Thomson Spot Welder Co. v. Ford Motor Co., 265 U.S. 445, 44 S.Ct. 533, 68 L.Ed. 1098, and on it there are concurrent findings by two lower tribunals.

 Moreover, since no fraud exists appellant cannot raise the question of patentability. It stands in the shoes of Lockhart, the patentee, and being in privity with appellee's assignor it is estopped to deny validity. Stubnitz-Greene Spring Corp. v. Ft. Pitt Bedding Co., 6 Cir., 110 F.2d 192, 195. In Westinghouse Electric & Mfg. Co. v. Formica Insulation Co., 266 U.S. 342, 349, 45 S.Ct. 117, 69 L.Ed. 316, the Supreme Court declares that the assignor cannot be heard to question the right of his assignee to exclude him from the use of the patent. Cf. St. Joseph Iron Works v. Farmers Mfg. Co., 4 Cir., 106 F.2d 294. These cases are based on the established rule that the licensor is not entitled to destroy or to restrict the enjoyment of the rights which he has granted to another.

 Since fraud was not shown in procuring the patents, the District Court correctly denied the relief sought, including the rescission of the contracts between appellant and appellee. As inadvertence, mistake or accident was not shown in the framing of the patent application the District Court rightly denied the application for an order of disclaimer. Title 35 U.S.C. § 65.[4]

The judgment of the District Court is affirmed.

4. Now 35 U.S.C.A. § 253.