**BLASTCRETE EQUIPMENT CO., Inc.,**
**Plaintiff,**

v.

**RIDLEY AND CO., Inc., a corporation,**
**Ian M. Ridley, Richard L. Klosterman, et al., Defendants.**

**No. 20821.**

United States District Court
S. D. California,
Central Division.

June 22, 1959.

Carlos G. Stratton, Los Angeles, Cal., Clifford E. Enger, Beverly Hills, Cal., for plaintiff.

James T. Moore, Los Angeles, Cal., F. A. Utecht, Los Angeles, Cal., for defendants.

YANKWICH, District Judge.

The second amended complaint on which the case was tried charged patent infringement and unfair competition. 28 U.S.C.A. § 1400(b). At the conclusion of the plaintiff's argument I expressed the view that there was no proof of unfair competition by misappropriation of trade secrets or otherwise. A further study of the matter reenforces me in the view.

## I

### No Unfair Competition

In this case I. M. Ridley, late in 1951 and early in 1952, assigned his invention contained in Letters Patent 2,569,952, issued to him on October 2, 1951, and 2,594,072, issued to him on April 22, 1952, both relating to a cement gun apparatus, to the plaintiff corporation in consideration of their advancing money for the exploitation of the invention and a portion of the company's corporate stock, which he received. Both plaintiff and Ridley prior thereto had been en-

gaged in sandblasting work as contractors. The inventor saw great possibility for use of the apparatus in foundries which had just begun to use such equipment for applying refractories. The plaintiff financed the building of the device described in the patents. The inventor assisted in the development of the structure.

By the end of 1953 difficulties arose and Ridley's interest and that of others was acquired by James R. Douglas and members of his family who now control the corporation. Ridley was retained for some months as a salesman. That employment was terminated late in 1954 when he sold a device his former associates felt should not have been sold to the public. Neither he nor the defendant Richard L. Klosterman, an engineer, had a definite contract of employment. When they left they took no drawings or secret data which belonged to the plaintiff. It is true that later, in 1955, the defendant Klosterman was employed by Ridley and that they solicited former customers of the plaintiff for a cement gun apparatus which he was manufacturing. But the companies solicited were chiefly foundries and dealers in foundry supplies engaged in various activities in the metallurgical world, the names of which were familiar to anyone in the trade and could be found in trade directories.

■ Much is made of the fact that the defendant Ridley knew that the plaintiffs were leasing the equipment and proceeded to place his own equipment on a lease basis in competition with theirs, when the leases expired. The court is aware of the fact that, in the case of much equipment of a bulky or expensive character, the owners of the patents lease them out, at times even insisting that the operation be by their own employees. Martin v. Ford Alexander, D.C. 1958, 160 F.Supp. 670, 686.

■ After severing their relationship with the plaintiff neither Ridley nor Klosterman, against whom the action was dismissed by the Court in open court, had *any obligation* not to engage in competitive business with the plain-

tiff. They took away no trade secrets. Sarkes Tarzian, Inc. v. Audio Devices, Inc., D.C.1958, 166 F.Supp. 250. In fact, whatever the plaintiff corporation knew about the device was taught to them by Ridley, through his patent or his work and that of Klosterman. Hence the conclusion that no unfair competition has been shown.

## II

### No Infringement

■ The only real question in the case is whether the apparatus which the defendant is manufacturing since 1955 infringes the patents which he has assigned to the plaintiff. I am of the view that it does not, that the apparatus is constructed on entirely different principles from the principles of the patents owned by the plaintiffs and that it conforms more to the "aspiration" method of agitating the material to be found in such patents as B. G. Call, Letters Patent 2,240,205, than to the teachings of the Ridley patents.

In order to expell a substance from a container through a nozzle and apply it elsewhere, even if it is fluid, as in paint spray guns, pressure must be exerted on it. If it be partly solid it must be constantly agitated in order to go through the orifice which brings it into the nozzle. In the Ridley patented devices this is done by means of a finger-like stirring element which, by rotation, keeps the semi-solid mass moving and pushes it towards the orifice. Essentially, agitation of the material to be expelled is done by the moving prongs of this simple mechanical device. In the accused device the agitation is achieved, through a different and complicated piece of machinery, *by aspiration*.

■ It is true that, ordinarily, the addition of elements to a combination does not avoid infringement. Walker on Patents, Deller's Ed., 1937, Vol. 3, § 460, pp. 1693–1695; Haynes Stellite Co. v. Chesterfield, 6 Cir., 1927, 22 F.2d 635, 638; Aluminum Co. of America v. Thompson Products, Inc., 6 Cir., 1941, 122 F.2d 796, 799; Holland Co. v. American Steel

Foundries, 7 Cir., 1951, 190 F.2d 37, 38–39. But the same authorities and others teach that if the addition results in a new combination, invention exists. Walker, op. cit., § 466; Graver Tank & Mfg. Co., Inc. v. Linde Air Products Co., 1950, 339 U.S. 605, 607–609, 70 S.Ct. 854, 94 L.Ed. 1097; Remington Rand v. Meilink Steel Safe Co., 6 Cir., 1944, 140 F.2d 519, 521–522. In the case before us there are new elements and the combination of these elements is entirely different. So is the method and principle they embody —*mechanical agitation* in the patented device, *aspiration* in the accused device. The broadest reading of the Ridley claims could not bring the accused device within its scope. Admittedly, there is similarity of function. But as stated in a case from the Seventh Circuit:

> "Functions may well be investigated and examined to ascertain the range of mechanical equivalents. But there is no basis for asserting infringement because of similarity of functions. *There must be similarity of elements which perform the desired functions before infringement is shown.*" Jogger Mfg. Corporation v. Roquemore, 7 Cir., 1941, 118 F.2d 867, 870. (Emphasis added.)

### III

### The Doctrine of Estoppel

The argument that the defendant Ridley, by his representations, so expanded the scope of his patent as to insure against any competition lacks substance in fact and law. The courts have held that an assignor of a patent could not question the validity of the patent if sued by the assignee for infringement. Westinghouse Electric & Mfg. Co. v. Formica Insulation Co., 1924, 266 U.S. 342, 45 S.Ct. 117, 69 L.Ed. 316. But the *Formica* and subsequent cases hold that in any suit between the assignor and the assignee the state of the prior art may be gone into in order *to show the limits of the patent monopoly.* The assignor is not debarred from showing that the patent has expired or that the broad interpretation sought by the assignee would place the patent in the public domain. This for the reason that what is in the public domain cannot be the subject of "private barter, sale, or waiver". Scott Paper Co. v. Marcalus Mfg. Co., Inc., 1945, 326 U.S. 249, 257, 66 S.Ct. 101, 105, 90 L.Ed. 47. As stated in the same case:

> "The patent laws preclude us from saying that the patent assignment, which they authorize, operates to estop the assignor from asserting that which the patent laws prescribe, namely, that the invention of an expired patent is dedicated to the public, of which the assignor is a member." 326 U.S. at page 257, 66 S.Ct. at page 105.

And see, Katzinger Co. v. Chicago Metallic Mfg. Co., 1947, 329 U.S. 394, 400–401, 67 S.Ct. 416, 91 L.Ed. 374; Hall Laboratories, Inc. v. National Aluminate Corp., 3 Cir., 1955, 224 F.2d 303, 306–307.

In its broadest sense, the doctrine of estoppel means that if the assignor, through the assignment or through representations, has, prior to or at the time of the assignment, given a broad scope to the invention, he is estopped from later narrowing such scope. Wilson v. Byron Jackson Co., 9 Cir., 1937, 93 F.2d 572, 576. These cases follow the established rule stated by the Court of Appeals for the Sixth Circuit:

> "that the licensor is not entitled to destroy or to restrict the enjoyment of the rights which he has granted to another." Becton Dickinson & Co. v. R. P. Scherer Corp., 6 Cir., 1954, 211 F.2d 835, 843.

But the law of estoppel *does not* go so far as to hold that an assignor can bind himself, except by an agreement, limited as to time and territory, not to engage in competition with his assignee. West's Ann.Cal.Bus. & Prof.Code, §§ 16601, 16602; Restatement, Agency, § 396. Nor is he forbidden to manufacture a device which is either in the public domain or conforms to a patent which has expired or is not owned by the assignee.

## IV

### No Estoppel, In Fact or Law

The claim of the plaintiff in this case seems to us to go beyond what the courts have sanctioned in dealing with the rights of the assignee of a patent. By attributing to Ridley a representation that the patents "would prevent any competitors from building a cement gun with an agitation system", they would, contrary to accepted law (See Restatement, Agency, § 396), deprive him of the right to engage in competition with them. For, in reality, they *claim* not only the benefit of the patents which they have acquired and which they have marketed successfully to their profit, but also the benefit of a competitive business based upon a device which *does not* infringe and which Ridley, with the assistance of others, has developed since they forced his separation from the plaintiff.

On a close analysis of the testimony I am of the view that the version of the transaction given by Ridley is the more credible one. He is not an engineer. When he approached Mr. Douglas and others with his patents, he told them the advantages he saw in them and explained to them that a machine could be constructed that would "meet" *existing competition* in the field, not "exclude" *all future competition* in a crowded field. Several machines in the market and known to Douglas were discussed and the differences between them and Ridley's invention were explained. To quote from the transcript:

> "The Witness: \* \* \* My representations were on the mechanical features of this gun, the practical end of it. They were not on the patent end of it. I laid the patent down, and I said, 'Here is the patent, and this is the machine that it covers, and this machine will do this and that in the industry. We have the foundry industry, which is just beginning to use this kind of equipment, the field has just been opened up, and I think there is a wonderful business there.

"And it has proved that there was a wonderful business there. Both of these companies are in this field and both making money as a result. That was my representation to these people.

"The Court: How did you explain the difference between your patent, —the agitator in your patent and any other agitators?

"The Witness: I explained it to them exactly as I explained it to the court this morning, Your Honor, describing this feed mechanism.

"The pictures were plainly shown in the patent. I referred to them. I handed the patents to these people, and they had plenty of time to have patent counsel to advise them.

"I did my best to explain it but, as I have shown, I am not an expert on these things, and I explained it from the practical standpoint, that it was a good business to go into.

"I sold them on the basis that it was a good business to go into, *not that the patents were impregnable. I don't think any patent is impregnable.*

"The Court: I think you have uttered \* \* \* wisdom, sir. You get a patent, and you are in a lawsuit. Go ahead. I understand that after that, when it came to constructing a device, you modified your ideas and got out various models, and you never slavishly followed the drawings as you had them in your patent, but that you learned as you were going along; isn't that true? A. Yes, sir. We improved on those.

"The Court: *And you gave the company the benefit of whatever improvements you made?*

"The Witness: *Right up until the last date.*

"The Court: *I beg pardon?*

"The Witness: *Right up until the last date."* (Transcript pp. 272, 273.) (Emphasis added.)

Ridley *did not* and *could not* guarantee against *all* competition in the field for there were competitive mechanisms, many of which were cited in the Patent Office when the two applications were pending, and there was likelihood of others appearing in the future.

■ In the circumstance, I am of the view that, neither through the assignment of the patents nor through any representation, did Ridley bind himself *not to engage in competition with an apparatus which does not infringe.*

At the time the negotiations for the sale of the patents were had, James William Peacock was in the process of acquiring some of the corporation's stock. He was with the concern while the first machines were built. While he transferred his stock to another, before the certificate was actually issued, he participated not only in the negotiations but in the discussions thereafter. He is a disinterested witness. And he categorically denied at the trial that, either at the time of purchase or while the machine was being developed, *was any such statement made by Ridley.* We transcribe from the reporter's notes the question and answer containing this denial:

"Q. Let me ask you Mr. Peacock, while you were connected with Blastcrete Equipment Co. did you ever hear Mr. Ridley make a statement to the effect that because the Blastcrete Equipment Co. owned the Ridley patents they would be able to keep out competitors utilizing *a gun having an internal agitating system?* A. No, sir."

Conclusion

The upshot of the matter is this: Even assuming that, as held in Wilson v. Byron Jackson Co., supra, representations by a patentee as to the interpretation to be placed on a patent may be considered as inducing the purchase of the patent, and that, in a proper case, such representations may amount to an estoppel *in pais*, the preponderance of the credible evidence in the case leads to the conclusion that (1) no such representations as claimed by the plaintiff were made by Ridley; (2) that the accused device now manufactured by Ridley, according to the teachings of another patent, does not include the plaintiff's device and (3) that there is nothing in the agreement or conduct of the parties to warrant the conclusion that Ridley, *by act or deed,* can be legally prevented from manufacturing the accused device.

■ If the accused device were an improvement upon the Ridley device, it is conceivable that, under the law of estoppel, he might be compelled to convey his rights thereto to the plaintiff, *even if such rights would not exist in favor of a stranger manufacturing it,* and the rights of the assignee would be protected either by directed assignment of the patent rights or specific performance. However, as already shown, the accused device has elements not contained in Ridley and is built on an entirely different principle. No patent application as to it is pending. None is contemplated. Indeed, I share the view of Ridley's patent counsel that the accused device is not patentable.

It follows, therefore, that the plaintiff is not entitled to recover either on the cause of action for patent infringement or on the causes of action for violation of trade secrets and unfair competition.

Judgment will, therefore, be for the defendant that plaintiff take nothing by its complaint. Costs to the defendant. No attorneys' fees. Formal findings and judgment to be prepared by counsel for the defendant under Local Rule 7, West's Ann.Code.